SLIP OPINION

Cite as 2017 Ark. 331

# SUPREME COURT OF ARKANSAS

No. CV-17-298

| | | |
|---|---|---|
| | | **Opinion Delivered:** November 30, 2017 |
| NATHAN COOPER | | |
| | APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTEENTH DIVISION [NO. 60DR-12-954] |
| V. | | |
| SHANNON KALKWARF (COOPER) | | |
| | APPELLEE | HONORABLE H. VANN SMITH, JUDGE |
| | | REVERSED AND REMANDED; COURT OF APPEALS' OPINION VACATED. |

**COURTNEY HUDSON GOODSON, Associate Justice**

Appellant Nathan Cooper appeals the Pulaski County Circuit Court's order granting appellee Shannon Kalkwarf's petition to relocate with the parties' minor son. For reversal, appellant argues that the circuit court erred in applying the presumption in favor of relocation as set out in *Hollandsworth v. Knyzewski*, 353 Ark. 470, 109 S.W.3d 653 (2003). We vacate the court of appeals' opinion, and we reverse and remand.

The parties were married on July 8, 2006. At the time of their divorce on July 9, 2012, they had one minor son, B.C. (DOB 5/31/09). The parties executed a written custody, visitation, and property-settlement agreement that was incorporated, but not merged, into the divorce decree. With regard to custody of B.C., the agreement stated that the parties were to share "joint legal custody" but that appellee would have "primary

physical custody of the minor child, subject to the reasonable and liberal visitation" of appellant. The agreement failed to define either term. The agreement further provided that appellant would have visitation with B.C. "a minimum of three nights out of every seven days with two days being consecutive." Holiday visitation alternated between the parties each year, and both parties were also granted "two non-consecutive weeks of vacation visitation during the summer." In addition, each parent agreed to contact the other parent for overnight childcare before he or she sought child care from a non-relative third party. The agreement stated that neither party was allowed to remove the child from the state without the express written consent of the other party or a court order authorizing the removal. Appellant was to pay child support of $470 a month based on his monthly income of $2,600. Appellee was required to continue to maintain health insurance coverage for B.C., and the parties were to equally divide any noncovered medical, dental, orthodontic, or prescription-drug expenses.

Appellee remarried in December 2015, and on January 15, 2016, she filed a petition for modification of custody. Appellee alleged that her husband had accepted a fellowship in trauma surgery in Houston and that it would be in B.C.'s best interest for her to be permitted to relocate with the child. Appellant filed a response to the petition on February 23, 2016, asserting that despite the language of the decree, the parties had shared joint custody of B.C. and that appellee should not be entitled to a presumption in favor of relocation. Appellant admitted that there had been a material change in circumstances caused by appellee's desire to relocate, but he denied that it was in B.C.'s best interest for the petition to be granted.

2

On June 3, 2016, appellant filed a motion for joint custody, alleging that there had been a material change in circumstances since the entry of the divorce decree warranting a modification of the custodial arrangement and visitation schedule. He asserted that the parties spent equal time with B.C. and that he had almost daily contact with the child. Thus, he indicated that it was in B.C.'s best interest for both of his parents to remain in Little Rock and continue with the joint-custodial relationship that the parties had enjoyed since the divorce. He requested that the decree be modified to reflect the parties' practice, that appellee's petition for relocation be denied, and that a joint-custody award be entered. Appellee filed a response to appellant's motion generally denying the allegations.

A relocation-and-custody hearing was held on July 11, 2016. Appellee testified that she had filed her petition requesting to relocate with the parties' son because her new husband, Kyle Kalkwarf, had accepted a fellowship in trauma surgery in Houston that would enable him to double his salary from $200,000 to $400,000. Appellee stated that, following the fellowship, there was a possibility that the family would return to Little Rock. She testified that they had found a rental home within walking distance of an elementary school that was ranked as one of the top ten public schools in Texas. Appellee indicated that she was a nurse practitioner and that she had taught at the College of Nursing at the University of Arkansas Medical School until May 2016. She stated that she had been offered a similar position in Houston with a higher salary and that she would also be able to pursue a doctoral degree. Appellee testified that, although B.C. had no extended family in Texas, Kyle's parents lived in San Antonio, and B.C. had a close relationship with them. Appellee also indicated that Kyle's parents had started a college fund for B.C. and had promised to match

3

any future contributions made by her and Kyle. Appellee admitted that the majority of B.C.'s extended family lived in Arkansas, including both sets of grandparents, with whom B.C. had a very close relationship.

Appellee testified that she was named as the primary physical custodian in the divorce decree and that the parties' conduct since then had been consistent with the decree. Although appellee had custody of B.C. for four nights each week while appellant had custody for three nights under the terms of the decree, appellee stated that they had modified this arrangement to a 5–5–1–3 schedule to provide more stability during the school week. Appellee testified that under this revised schedule, she still had custody of B.C. for eight days out of every fourteen-day period, while appellant had custody for six days. However, appellee stated that appellant had also asked her to keep B.C. on days when he was supposed to have custody. According to the calendar she had kept since June 2014, appellee indicated that she had custody of B.C. approximately sixty percent of the time.

Appellee indicated that the parties had a good relationship when it came to coparenting, although there had been a few issues. For instance, appellant had not reimbursed appellee for his half of B.C.'s medical expenses that were not covered by insurance, and he had never contributed to B.C.'s private-school tuition. Appellee further testified that she had been responsible for buying B.C.'s clothing and school uniforms, although she admitted that appellant had recently bought several sets of uniforms. Appellee stated that appellant had rarely gone to B.C.'s medical appointments unless she specifically requested that he accompany them. Appellee also testified that appellant had been very condescending and rude in some of their prior communications.

4

Appellee testified that, despite her issues with appellant, he is a good father, and it is very important for B.C. to continue to have appellant in his life. She proposed a schedule whereby appellant would come to Houston one weekend each month to visit B.C., and she would pay for herself and B.C. to fly to Little Rock one weekend per month. Appellee also indicated that appellant could have one week with B.C. at Christmas and six weeks in the summer. She admitted that this would reduce appellant's visitation from 156 days a year to 110. However, appellee testified that B.C. and Kyle also have an exceptional relationship and that it is in B.C.'s best interest to relocate with them.

Kyle testified that he has a very loving relationship with B.C. and that they participate in many activities together. According to Kyle, the relocation presents several advantages for B.C., such as a better school and more opportunities for sports and other hobbies. Kyle testified that, after his two-year fellowship, he would most likely choose a trauma-surgeon position in Little Rock, San Antonio, or Houston.

Jeannie Thompson, the mother of appellant's girlfriend, testified on behalf of appellant. Thompson stated that appellant and her daughter, Jessica, had been dating for more than one year and that she considers B.C. one of her grandchildren. According to Thompson, appellant is very affectionate and supportive of B.C. and "puts him at the top of his list." Thompson further stated that B.C. and Jessica's thirteen-year-old daughter adore each other.

Appellant testified that B.C. does well with the parties' current 5–5–1–3 visitation schedule. Appellant indicated that, under the terms of the divorce decree, he was allowed only two consecutive days with B.C. each week, so he typically had the child each weekend

and for one additional night during the week. However, appellant stated that the parties altered the visitation schedule after B.C. started school to provide more consistency. Appellant testified that he has a good relationship with appellee, even though he admitted that he had said some things that he regretted and that he had "nickel and dimed" her in the past. He indicated that, especially right after their divorce, he and appellee had "an open door policy" and had often spent holidays together with B.C. However, appellant stated that their communication with each other had decreased since appellee had filed her petition to relocate.

Appellant stated that he worked next door to B.C.'s school and that this afforded him additional opportunities to see his son. He introduced a calendar in which he had marked the days that he had seen B.C., and, according to appellant's calculations, he had spent time with his son on 60%-65% of the days between August 2014 and May 2016. Appellant testified that he was very concerned about not being able to maintain this type of relationship with B.C. if B.C. were to relocate with appellee. He stated that he was not trying to take custody away from appellee. Instead, he wanted the circuit court to deny appellee's request to relocate with B.C. and for the parties to continue their current custody arrangement. Appellant further stated that B.C. has a close relationship with his parents and with his aunt, uncle, and cousins who live in Little Rock. Although appellant admitted that he had become a more involved father since appellee filed the petition to relocate, he indicated that this was because he wanted to maximize his opportunities with B.C. When the circuit court questioned appellant as to how it would affect B.C. if the court denied

appellee's petition to relocate, appellant testified that appellee had indicated that she would not choose to move in that event.

On cross-examination, appellant stated that the parties had agreed in the divorce decree to share joint legal custody, with appellee being the primary physical custodian. Appellant testified that he understood joint legal custody to mean that he had the same legal rights to B.C. as appellee. He indicated that appellee was named as primary physical custodian in the decree because she had custody for one more day a week than he did. Appellant further testified that appellee's having primary physical custody meant that if there was a disagreement that the parties could not settle, then she would have the last vote. However, he stated that this did not include the issue of relocation.

Following the hearing, the circuit court entered an order on August 4, 2016, granting appellee's petition to modify custody and to relocate with B.C. and denying appellant's motion for joint custody. The court stated that one of the primary issues to be resolved was whether the parties shared joint custody, such that the relocation request would be controlled by *Singletary v. Singletary*, 2013 Ark. 506, 431 S.W.3d 234, or whether one of the parties had sole or primary custody and was entitled to the presumption set forth in *Hollandsworth*, *supra*. The circuit court made the following findings in its order:

> 23. As noted above, the parties' Agreement states "wife will have primary physical custody of the minor child, subject to the reasonable and liberal visitation with husband as set out below in this Agreement. The parties will share joint, legal custody." The Agreement fails, however, to define the meaning of primary physical custody.
>
> 24. In both *Singletary* and *Jones* courts were confronted with similar situations where language was ambiguous. *Singletary*, 2013 Ark. 506 at 9, 431 S.W.3d 234; *Jones*, 2015 Ark. App. 468 at 10, 469 S.W.3d 402. In both cases, the court looked to the contract

7

between the parties in its entirety, the testimony of the parties about their intent, and the conduct of the parties. *Id*.

25. The parties initially agreed that "Husband will have the minor child at a minimum of three (3) nights out of every seven (7) days with two (2) days being consecutive." The Agreement is ambiguous, however, as it does not specify which parts of the three (3) days the Defendant will have as his visitation, particularly when he only has two (2) days consecutively. Still, the division of time was clearly not 50/50.

26. Both parties testified that they later mutually agreed to a modification of the Agreement arriving at the aforementioned 5–5–1–3 visitation rotation they currently practice.

27. This 5–5–1–3 rotation unambiguously placed the child with the Defendant six (6) days out of fourteen (14) or approximately 42.9% of the time.

28. The Agreement further provides that Defendant will pay child support of $470.00 per month to the Plaintiff.

29. The Defendant testified that the phrase "primary physical custody" meant the Plaintiff had the final say on matters such as medical decisions. The Defendant also testified that Plaintiff was the primary physical custodian because she had B.C. one more day per week than he did.

30. The Plaintiff testified that she enrolled B.C. in private school and bore the cost of the same, that she bought the majority of B.C.'s clothes, paid for B.C.'s haircuts, and took B.C. to all of his doctor's appointments.

31. Given the Agreement in its entirety, the intent of the parties, and the conduct of the parties the Court finds that the parties did not enjoy true joint custody.

32. Where parties do not share joint custody, one party must necessarily be the primary custodian. In the present case, even with the modification to a 5–5–1–3 schedule, the Plaintiff remains the primary custodian of B.C. as was set out in the Decree.

33. Accordingly, the Court utilizes the *Hollandsworth* factors to decide the issue of relocation and presumes that it would be in B.C.'s best interest to relocate with the Plaintiff. The Court considers the Defendant's case as an attempt to rebut that presumption.

The circuit court then went on to discuss and make detailed findings regarding each of the *Hollandsworth* factors. Based on its findings, the court indicated that it could not conclude that the relocation was against B.C.'s best interest. However, the court modified appellee's proposed visitation schedule to ensure that appellant's time with B.C. was not as dramatically reduced. In addition to two weekends of visitation each month, the court awarded appellant additional holiday visitation and nearly all of B.C.'s summer vacation. The circuit court further lowered appellant's child-support obligation to $225 a month to offset his travel costs and abated the child support by 50 percent during summer visitation. The circuit court concluded its order by noting its frustration with the current state of the law on relocation:

> 55. The Court notes that the area of relocation law is not clear, and that there appears to be no bright line test as to when *Hollandsworth* applies or when *Singletary* and *Jones* apply, other than when the facts and language in the custody order are unambiguous. As in the present case, and in other cases this Court has heard, the facts dictate which test to use, and the decision to use either *Hollandsworth* or *Singletary* can drastically affect the outcome. Often, the facts presented to the Court are so close that one or two small details will push the Court to utilize one case over the other which can change the outcome of the decision.
>
> 56. It is not this Court's place to suggest a change in the relocation law, but it appears that the better test would always place the burden on the party wishing to relocate and put more emphasis on what is in the best interest of the child in making the decision.

Appellant timely appealed the circuit court's order to the court of appeals, which reversed and remanded in a divided decision. *Cooper v. Kalkwarf (Cooper)*, 2017 Ark. App. 405, 525 S.W.3d 508. Appellee filed a petition for review with this court, which we granted. When we grant a petition for review, we treat the appeal as if it had been originally filed in this court. *Moore v. Moore*, 2016 Ark. 105, 486 S.W.3d 766.

9

Appellant argues on appeal that the circuit court erred by applying the *Hollandsworth* presumption to appellee's relocation petition. We review matters that sound in equity de novo on the record with respect to factual questions and legal questions. *Singletary*, *supra*. We will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Id*. A finding is clearly erroneous when, despite supporting evidence in the record, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Id*. We also give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Id*. This deference is even greater in cases involving child custody, as a heavier burden is placed on the trial judge to use his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91.

In *Hollandsworth*, *supra*, this court announced a presumption in favor of relocation for custodial parents with sole or primary custody, with the noncustodial parent having the burden to rebut this presumption. We stated that relocation by a custodial parent is not, by itself, a material change in circumstances justifying a change in custody. *Id*. We further held that the polestar consideration in such determinations is the best interest of the child and that the circuit court should consider the following factors: (1) the reason for relocation; (2) the educational, health, and leisure opportunities available in the new location; (3) a visitation and communication schedule for the noncustodial parent; (4) the effect of the move on extended family relationships in the new location as well as in Arkansas; and (5) the child's preference, taking into account the child's age and maturity, as well as the reasons given by the child for the preference. *Id*.

10

In *Singletary*, we explained that the *Hollandsworth* presumption does not apply when the parents share joint custody of a child. *Id.* at 8, 431 S.W.3d at 239–40. In a joint-custody arrangement where both parents share equal time with the child, there is not one parent-child relationship to take preference over the other, and the *Hollandsworth* rationale is inapplicable. *Id.* at 9. Instead, we held that the proper analysis for a change-in-custody request due to the relocation of one parent in a joint-custody situation is the same as that when relocation is not involved; the court must first determine whether a material change in circumstances has transpired since the divorce decree and then whether the change in custody is in the best interest of the child. *Id.*

In determining whether the circuit court erred by finding that appellee was entitled to the *Hollandsworth* presumption under the facts in this case, we first look to the language in the divorce decree, which incorporated by reference the parties' agreement as to custody and visitation. Our standard of review for issues of contract interpretation was set forth in *Singletary*:

> The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. In construing any contract, we must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning. The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties themselves viewed it. It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement.
>
> This court has explained further that when an ambiguity exists in a contract, we are permitted to look outside the contract to determine the actual intent and conduct of the parties. In arriving at the intention of the parties, the courts may consider and accord considerable weight to the construction of an ambiguous contract or deed by the parties themselves, evidenced by subsequent statements, acts, and conduct.

11

*Id.* at 10, 431 S.W.3d at 240–41 (quoting *Wal-Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 371, 255 S.W.3d 424, 429 (2007) (internal citations omitted).

Here, the parties' divorce decree stated in the section titled "Custody" that "Wife will have primary physical custody of the minor child, subject to the reasonable and liberal visitation with Husband as set out below in this Agreement. The parties will share joint legal custody." The "Visitation" section of the agreement provided that "Husband will have reasonable and liberal visitation with the minor child as set forth herein. Husband will have the minor child at a minimum of three nights out of every seven days with two days being consecutive."

The circuit court found that the phrase "primary physical custody" was not defined in the decree and that the agreement was also ambiguous because it did not specify which parts of the three days that appellant would have for his visitation. We agree with the circuit court that the language in the parties' agreement was ambiguous. In *Singletary*, we held that the decree's use of the terms "joint custody" along with "primary custody" was ambiguous on its face. Here, as in *Singletary*, the decree states that the parties are to share joint legal custody but that appellee is the primary physical custodian. The decree then awards appellant nearly equal time with B.C. Thus, it is unclear from the language in the decree whether the parties had "joint custody" such that the *Singletary* analysis would apply, and the circuit court was correct in reviewing the parties' subsequent statements and conduct.[1]

---

[1] While appellant testified that he understood "primary physical custody" to mean that appellee had the final vote in the event the parties disagreed on an issue, this misunderstanding highlights the need for decrees, orders, and agreements regarding custody to define terms such as "primary physical custody" and "joint legal custody" so that the

The parties modified the visitation arrangement set forth in the decree to give more consistency to B.C. during the school week, although they agreed that the ratio of time spent with their son remained the same, with appellee having custody 42.9 percent of the time. Although appellee testified that she had custody of B.C. on more days than were provided in the decree, she did not refute appellant's evidence that the time he had spent with the child exceeded what was awarded in the decree. The circuit court also credited appellant's testimony in this regard, finding that he had some form of contact with B.C. on at least 60 percent of the days in the year. The court further found that under appellee's proposed schedule if she were to relocate with B.C., appellant's time with his son would be drastically decreased from 156 days to as few as 83 days, a 47 percent reduction. Based on its findings, the court stated that the relocation would adversely affect B.C.'s relationship with his father, as well as with his extended family in Arkansas.

Despite its findings, the circuit court concluded that appellee was nonetheless the primary custodian and entitled to a presumption in favor of relocation based on the fact that the parties' custodial arrangement was "not 50/50." We disagree and take this opportunity to clarify our prior holdings on this issue.

In *Hollandsworth*, *supra*, the mother who was seeking to relocate had been awarded primary custody of the children, and the father was only entitled to visitation during one half of the children's free time on weekends, holidays, and summer vacation. Our adoption of the *Hollandsworth* presumption in favor of relocation by the custodial parent was based on

---

intent and meaning of each phrase is clear to both the parties and the courts that must interpret this language.

the principle that "the custodial parent who bears the burden and responsibility for the child is entitled to seek a better life for herself or himself and the children, as enjoyed by the noncustodial parent." *Hollandsworth*, 353 Ark. at 477, 109 S.W.3d at 658. We further noted that, according to social-science research and literature, "what is good for the custodial parent is good for the child." *Id.* at 480, 109 S.W.3d at 653 (quoting *Baures v. Lewis*, 770 A.2d 214 (N.J. 2001)). As we then discussed in *Singletary*, *supra*, however, the rationale behind *Hollandsworth*, which was to preserve and protect the stability of the relationship between the child and the custodial parent with whom the child spent the majority of his time while balancing the custodial parent's right to relocate, simply does not apply to joint-custody situations. *Singletary*, 2013 Ark. 506, at 8, 431 S.W.3d at 240.

Since *Hollandsworth* was decided in 2003, the typical postdivorce custodial arrangement has evolved from a traditional custody situation, where one parent receives sole or primary custody and the noncustodial parent receives weekend visitation, to a shared-custody situation. This evolution is reflected in the 2013 amendment to our custody statute, Ark. Code Ann. § 9-13-101(a)(1)(A)(iii), which provides that awards of joint custody are now favored in Arkansas. *See* Act of April 11, 2013, No. 1156, §§ 1–3, 2013 Ark. Acts 4706–07.

However, shared-custody or co-parenting arrangements, such as the one here, have also made it difficult for circuit courts to determine which analysis to apply to a relocation request. This difficulty is evidenced by the circuit court's frustration in this case. As the circuit court here noted, it is often a difference of only one or two small details that persuades a court to utilize either the *Hollandsworth* or the *Singletary* analysis, and thus, these small

14

factual distinctions can ultimately change the outcome of the court's decision. Other state courts have grappled with this issue as well, and the recent trend has been to impose a best-interests test in all cases when considering a relocation application, regardless of whether that parent is designated as the primary custodian or whether the parties equally share custody. *See Bisbing v. Bisbing*, 166 A.3d 1155 (N.J. 2017) (noting that the majority of states, either by statute or by case law, now impose a best-interests test rather than a preference or presumption in favor of a primary custodian).

Despite this trend, we choose not to eliminate entirely the presumption in favor of a sole or primary custodian that was announced in *Hollandsworth*, *supra*, because the rationale supporting that decision remains persuasive in certain situations, such as in a traditional custody arrangement. Accordingly, we specifically reject the one-size-fits-all suggestion made by the circuit court in paragraph 56 of its order cited above. We instead clarify that the *Hollandsworth* presumption should be applied only when the parent seeking to relocate is not just labeled the "primary" custodian in the divorce decree *but also spends significantly more time with the child* than the other parent. This standard preserves the rights of a primary custodian when he or she has shouldered the vast majority of the responsibility of caring for and making decisions on behalf of the child, and it also more accurately reflects the best interest of the child, which is the polestar consideration in any custody decision. *Stehl v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009).

As the General Assembly has recognized, joint-custody arrangements cannot be defined with mathematical precision. *See* Ark. Code Ann. § 9-13-101(a)(5) (Repl. 2015) (defining joint custody as the "*approximate and reasonable equal division of time* with the child

15

by both parents . . . ." (emphasis added)). Thus, we do not attempt to oversimplify the issue of relocation by imposing an arbitrary percentage of time that a parent must spend with the child for the *Singletary* analysis to apply. Rather, by this opinion, we seek to recognize the realities of modern parenting and to emphasize that a joint-custody arrangement does not necessarily involve a precise "50/50" division of time. We further note that parental influence and commitment, involvement in the child's daily activities, and responsibility for making decisions on behalf of the child are important factors in the circuit court's consideration of the relocation issue. As the *Bisbing* court noted, recent social-science research has indicated that a close relationship with the parent of alternate residence is of critical importance to a child's well-being following a divorce. *Bisbing*, 166 A.3d at 1166. By limiting the *Hollandsworth* presumption to those situations where the child spends significantly less time with the alternate parent, the disruptive impact that a relocation would have on that relationship is minimized.

Here, both parties shared the responsibility for making decisions on B.C.'s behalf, and each parent has a significant and meaningful relationship with the child. Under the revised test discussed above, we conclude that the analysis set forth in *Singletary*, *supra*, governs appellee's relocation petition rather than *Hollandsworth*, *supra*. Accordingly, we reverse the circuit court's decision and remand for the court to apply this analysis to the facts in this case.

Reversed and remanded; court of appeals' opinion vacated.

KEMP, C.J., concurs.

BAKER, HART, and WYNNE, JJ., dissent.

16

**JOHN DAN KEMP, Chief Justice, concurring.** I join in the majority opinion. Still, I question whether "it serves . . . the interests of the children [or] the ends of justice to view relocation cases through the prisms of presumptions and threshold tests that artificially skew the analysis in favor of one outcome or another." *Tropea v. Tropea*, 665 N.E.2d 145, 151 (N.Y. 1996). Accordingly, I welcome the opportunity to consider whether to abandon the presumption of relocation altogether.

**JOSEPHINE LINKER HART, Justice, dissenting.** After consideration of our standard of review, I cannot say the circuit court's finding was clearly erroneous. Therefore, I must dissent.

To reiterate the majority, our standard of review for matters that sound in equity is de novo on the record with respect to both factual questions and legal questions. *Singletary v. Singletary*, 2013 Ark. 506, 431 S.W.3d 234. However, it is well settled that we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Id.* In legions of cases this court has opined that for a trial court to be clearly erroneous, despite supporting evidence in the record, the reviewing court must be left with a definite and firm conviction that a mistake has been committed. *Id.* Further, we give due deference to the superior position of the circuit court to view and judge the credibility of witnesses. *Id.* This deference is even greater in cases involving child custody, as a heavier burden is placed on the trial judge to use his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91.

When applying this standard of review to the case before us, it is clear from the record that the circuit court's decision was made after careful and thoughtful deliberation.

17

At the conclusion of the hearing on July 11, 2016, the court stated, "There's three cases that we talked about today that give the Court some direction on what to rule – or how to rule, and I'm going to take a little time and look at the decisions and then the facts, I'll make a decision." On August 4, 2016, the court entered an eleven-page order explicitly explaining its decision and why it had reached each of its findings. The details of the order indicate that the circuit court exercised careful deliberation in evaluating all four witnesses' testimony and in reaching the conclusion that the *Hollandsworth* presumption applied and that relocation was in the best interest of the child.[1] *Hollandsworth v. Knyzewski*, 353 Ark. 470, 109 S.W.3d 653 (2003).

Although the appellant argues that the circuit court erred in applying the *Hollandsworth* presumption, application of *Singletary* is correct only "when a change of custody was sought in a joint-custody arrangement." *Singletary*, *supra*.[2] However, as the court noted, "it is unclear whether the parties have 'joint custody' as contemplated under *Singletary* or whether one party enjoys 'sole or primary custody' as contemplated under *Hollandsworth*." It was only after vigilant consideration of the wording of the original agreement, the testimony from the parties about their intentions, and the lengthy testimony

---

[1] Contrary to the assertions of the concurring opinion, *Hollandsworth* does nothing more than place the burden on the noncustodial parent to establish that the move is not in the best interest of the child.

[2] When applying *Singletary*, "the trial court must first determine that a material change in circumstances has transpired from the time of the divorce decree and, then, determine that change of custody is in the best interest of the child." *Singletary*, 2013 Ark. 506, 431 S.W.3d 234. Both appellant and appellee stated in their original filings that a material change in circumstances had taken place, i.e. the appellee relocating to Houston, Texas, with their minor child; however, the circuit court did not expressly make that finding.

of all four witnesses regarding the conduct of the parties, that the court reached the decision that the parties did not enjoy true joint custody as proposed in *Singletary*.

In support of its decision, the court laid out multiple factual findings that made this case distinguishable from *Singletary*. In short, the division of time was not 50/50, the original agreement provides for appellant to pay child support, and appellant testified that the phrase "primary physical custody" meant the appellee had the final say on matters, and that phrase was chosen because appellee had B.C. one more day a week than he did. Additionally, testimony showed that appellee enrolled B.C. in private school and paid for the entirety of his tuition, bought the majority of his clothes, paid for all of his haircuts, and took him to all of his doctor's appointments. Based on these findings, the court applied *Hollandsworth* and carefully analyzed the five factors before determining that the relocation was in the best interest of B.C. It is important to note that *Hollandsworth* and *Singletary* both lead to the same analysis; the best-interest-of-the-child analysis. Even if, as the majority would suggest, *Singletary* was applied, there is no evidence in the record that weighs against the circuit court's finding that relocation is in the best interest of the child.

Additionally, the court's final statement of "frustration" should be considered in our review for reversible error. While the court indicated "the area of relocation law is not clear, and that there appears to be no bright line test as to when *Hollandsworth* applies or when *Singletary* and *Jones* apply," the court followed by stating, "As in the present case, and in other cases this Court has heard, the facts dictate which test to use." While there may be perceived confusion over precedent in like cases, the circuit court clearly articulated its understanding of the law and applied the facts to the law. Its written opinion evidences that

19

there is no need for further clarification on the controlling law, and neither a mathematical equation nor a set of dictatorial rules can or should become an easy solution. Ultimately, to do so would eliminate the best interest analysis, which has long been the polestar for issues involving child custody and relocation matters. *Hollandsworth*, *supra*. Furthermore, the clear findings by the circuit court in this case can only lead to the conclusion that a reviewing court cannot possibly be left with "a definite and firm conviction that a mistake has been made."

I respectfully dissent.

BAKER and WYNNE, JJ., join.

*LaCerra, Dickson, Hoover & Roger, PLLC*, by: *Lauren White Hoover*, for appellant.

*D. Paul Petty*, for appellee.