BART F. VIRDEN, Judge
Appellant Nicole Killingsworth (formerly Dittmar) appeals from the Sharp County Circuit Court's order awarding custody of her children, M.D. and A.D., to their father, appellee Jeremiah ("J.D.") Dittmar. Nicole argues that (1) the trial court erred in finding that a joint-custody agreement existed and concluding that her relocation was a material change in circumstances and (2) alternatively, even if a joint-custody agreement existed, it was in the children's best interest to remain in her primary physical custody. We affirm.
I. Procedural History
Nicole and J.D. divorced on July 6, 2015. A custody agreement was incorporated, but not merged, into the divorce decree, stating in part,
The Husband and Wife are to have joint custody of the minor children with the Wife being the primary residential custodian. The Husband shall have reasonable visitation at any time the parties agree. The Husband shall have visitation every week from Thursday at 6:00 p.m. until Sunday at 6:00 p.m. and holidays shall be divided pursuant to the Court's standard visitation schedule attached hereto as Exhibit Number 1.
....
(b) The parties shall abide by the Court's Proper Conduct rules as attached hereto as Exhibit Number 2.
Exhibit number 2, entitled "Proper Conduct of Divorced or Separated Parents," includes the following rule: "If you are divorced, DO NOT expose your children to any person with whom you may be living unless you are married to that person. Proper and acceptable contact and association with other persons after divorce is not prohibited under this rule."
On July 21, 2016, Nicole filed a motion to modify visitation and child support in which she asserted that she had moved from Cave City, Arkansas, to Viola, Arkansas, and that she had enrolled the children in school in Viola, where she now works. Nicole alleged that a material change in circumstances had occurred because she was no longer employed at White River Medical Center (WRMC) where she had been required to work weekends. Nicole alleged that she now works Monday through Friday and that the visitation schedule should be modified such that she will have the children every other weekend. Nicole further alleged that there was also a material change in circumstances regarding her need for support given that the parties now live a greater distance apart.
J.D. responded and alleged that the parties were true joint custodians and that Nicole had unilaterally moved the children to Viola to live with her boyfriend. J.D. alleged that there was no material change in circumstances but that, if the trial court determined that there was a material change, custody of the children should be awarded to him.
Nicole amended her motion to add that she is the primary residential custodian pursuant to the divorce decree and that *4 the parties did not share true joint custody.
J.D. responded to the amended motion, alleging that the parties had agreed to joint custody in the divorce decree. J.D. further alleged that the children had been enrolled in the Cave City School District and that, without notice or permission, Nicole had transferred the children to the Viola School District and had moved in with her boyfriend in violation of the proper conduct rules. J.D. counterclaimed that there had been a material change in circumstances warranting modification of the decree with an award of full custody to him.
In answering J.D.'s counterclaim, Nicole clarified that she had moved in with her husband, Robby Killingsworth, who was previously her boyfriend. Nicole asserted the affirmative defense of unclean hands, alleging that J.D. had moved his then girlfriend Stephanie Johnson into his home three days after the parties had separated and that she had continued to reside there until she and J.D. were married. Nicole further alleged that she had abided by the terms of the divorce decree after her relocation, that nothing in the decree required that she give notice or seek permission from J.D. to move to a neighboring county, and that J.D. was not in a position to adequately care for the children during the week.
II. Trial Testimony-January 25, 2017
Amy Rucker, a speech pathologist at the Viola School District, testified that she had been working with A.D., who has a mild language impairment and dyslexia. She said that he had an IEP (individual education plan) for speech therapy but that testing requested by Nicole indicated that he also had dyslexia. Rucker testified that Nicole is "very interested" in A.D.'s education and that his stepfather attended meetings with Nicole and asked about A.D. when picking him up from school. She said that she had never had any contact with J.D. She testified that she was unaware of the services offered by the Cave City School District but that school districts are expected to have the same testing capabilities. She said that A.D. had been doing much better since moving to Viola and that he seemed to be happy.
Erline Divelbiss, a dyslexia interventionist at the Viola School District, testified that she worked with A.D. four days a week. She stated that A.D.'s grades had improved since coming to the Viola School District. She said that, without the one-on-one help A.D. was receiving at Viola, he would not have made as much improvement as he has. She said that she would have concerns about A.D. regressing if he were moved to a different school and did not get such help. Divelbiss testified that she did not know of any school districts that did not offer the one-on-one help A.D. needed but that A.D. had been receiving only speech therapy at the Cave City School District. She stated that Nicole was "very cooperative" and "very compliant" with anything that needed to be done. Divelbiss had never met J.D. but had spoken with him once when M.D. was sick at school.
Nicole testified that she and J.D. divorced because he had been cheating on her with his current wife for the last two years of their marriage. She said that she and Robby had gotten engaged in December 2015. She stated that after losing her job at WRMC in February 2016, she and the children moved in with Robby in Viola in March 2016. She said that, although she had violated the order about not exposing the children to people with whom she is romantically involved, she thought that J.D. had done the same with his current wife. She testified that in June 2016 Robby *5 got divorced after twenty years of marriage; that she and Robby married on September 3, 2016; and that they are expecting a child on August 3, 2017.
Nicole testified that she is now a paraprofessional at the Viola School District and that she provides one-on-one care for a disabled boy. She said that she had gotten the job a week after losing her job at WRMC. She conceded that she had not applied for any jobs in Batesville, Cave City, or Ash Flat. She stated that at her previous job, she had worked ten-hour shifts on Fridays, Saturdays, and Sundays and that she now works Monday through Friday and has time off whenever the school district is not in session. She said that she is now able to spend quality time with her boys over the weekend and that she currently does not get to take them to movies or birthday parties because she does not have them on weekends. She said that if she does not have the boys some weekends, she is concerned that they may not be able to spend time with the new baby.
Nicole said that ten-year-old M.D. and eight-year-old A.D. started school in Viola the week after spring break. She said that J.D. did not learn the children would be attending the Viola School District until the weekend that they moved from Cave City. She said that at the Cave City School District, M.D. had been doing well academically but had been "having a hard time emotionally" and that he had cried when she dropped him off at school. She said that A.D. had Cs, Ds, mostly Fs, and maybe a B while attending the Cave City School District. She said that she thought A.D. required extra help but that the Cave City School District had not made the changes she requested and had even taken him out of occupational therapy and reading programs. She said that she had spoken with J.D. about A.D.'s needing extra help at school but that J.D. had refused to go to the school to speak with the teachers about it and had said that there was nothing wrong with his child. Nicole stated that she had A.D. tested at Miracle Kids in Jonesboro and learned that he has characteristics for dyslexia and ADHD.
Nicole testified that the children are "doing great" at the Viola School District. She said that J.D. is "a good dad" and was involved "sports-wise at school." She said that she was afraid that, if J.D. had the children through the week, they would not receive the same type of academic attention that they are currently receiving. Nicole stated that Robby is a "wonderful stepdad," helps the boys with their homework, and had taken them hunting. She said that Robby was the first to mention that A.D. might be dyslexic.
Nicole said that she now lives fifty-one miles from J.D. and that it is an hour's drive from Viola to Cave City. She said that she thought that, as the primary residential custodian, she had "the say" in where the children lived and went to school. Nicole stated that her lawyer had prepared the agreement in the divorce proceedings and that J.D. had refused to sign it unless it provided for "joint custody."
Robby testified that he had lived in Viola most of his life. He said that he had been an insurance adjuster and had traveled for his job but that he is now unemployed after having had a bad car wreck in 2012. He said that he currently draws workers'-compensation benefits and will apply for disability. He said that he met Nicole around Thanksgiving in 2015. He said that they became engaged and decided that they wanted children together so Nicole had gotten "her tubes reversed." He said that, after having two weeks off for the surgery, Nicole lost her job at WRMC. He said that he helps the children *6 with their homework, cooks, gets them up and ready for school in the mornings, and takes them to meet the school bus. He said that early on in his relationship with Nicole, A.D. had drawn him a picture and written his (Robby's) name on it. Robby stated that he told Nicole that he thought A.D. might be dyslexic like him. He said that, although he had helped raise his ex-wife's children, he did not have the bond with them that he has with M.D. and A.D.
M.D. testified that he likes the Viola School District. He said that he likes it better than the Cave City School District because Cave City has a football team, he does not like football, and his dad wants him to play football. M.D. testified that he does not like having to get up early while at his father's home. He explained that they must leave for school in Viola at 6:45 a.m. M.D. said that he would like to live with his mom in Viola and spend some weekends with her so that they could go on vacations. He testified that he likes his stepparents but that his dad and stepmother smoke and fight.
J.D. testified that he began seeing his wife, Stephanie, in October 2015 and denied having had an affair or sexual relations with her prior to his divorce from Nicole. He said that they were married in April 2016 and that she moved in with him in May 2016. He stated that she did not spend the night with him when his children were present. He said that his wife's children are friends with M.D. and A.D. and that they play together.
J.D. testified that he has worked as a master plumber for twelve years and that he does not work on Fridays or on weekends. He agreed that it was fair for Nicole to have the children on some weekends considering her new schedule. He stated, however, that he wanted his children back at the Cave City School District because they had grown up and have family and friends there. He stated that he volunteers as a coach for the Cave City High School Booster Club. He said that M.D. plays baseball, that he had not missed any games and did not remember missing any practices, and that M.D. also plays baseball at Viola and that he had not missed any of those games. J.D. said that, while both boys are athletically inclined, if either of them did not want to play sports, it was okay. J.D. conceded that he did not understand A.D.'s symptoms before but that he does now. He stated that A.D. will get the help he needs at school if he comes back to Cave City.
J.D. testified that his wife smokes cigarettes and that the children have seen him smoke cigars. He stated that he cannot take M.D. hunting because he has a seventeen-year-old felony conviction involving marijuana in California. He said that he had smoked marijuana since his divorce from Nicole and that he had smoked marijuana with Stephanie four or five months ago.[1]
J.D. said that when he agreed to joint custody, he was under the impression that he had "equal rights with the kids." He said that he would not have signed the agreement if he had known that Nicole "could get up and move with the kids."
Stephanie testified that her children are seven and nine years old, that she works at a restaurant in Cave City, and that she could change shifts at work or have her grandmother watch M.D. and A.D. if they came to live with her and J.D. Stephanie conceded that she smokes every day but *7 said that she does not smoke inside the house.
III. Trial Court's Ruling and Order
In ruling from the bench, the trial court first determined that the language from the divorce decree "sort of muddied the waters" with the term "primary residential custodian" but that there was only some possible advantage in the time division in Nicole's favor in that she had the boys four days a week and that J.D. had them three days a week. The trial court concluded that the parties had a true joint-custody arrangement.
The trial court noted that the parties agreed there was at least one material change of circumstances. The trial court found that the parties' remarriages were not material changes; however, the trial court found that there were changed circumstances in that the children are now required to get up "very early in the morning" to make a fifty-mile trip to school every Friday; that the previous visitation arrangement had been based on Nicole's employment schedule and that she had since lost that job; that Nicole had removed the children from the Cave City School District and enrolled them in the Viola School District; and that she had moved the children into the home of her fiancé six months before they were married in direct violation of the court's order. The trial court found that these changed circumstances were the direct result of choices made by Nicole and that the changes were "made by her not as a sole custodial parent, but as a joint custodian, and were made without consultation or consent of the other joint custodian." The trial court pointed out that Nicole had made decisions "primarily to foster her romantic relationship rather than consideration of the best interest of the children." The trial court also found that there is "virtually no distinction" between the school districts, that they are both good school systems, that they offer the same or approximately the same services and quality of services, and that there is "no significant advantage" to the children being in one school district over the other. In changing custody of the children to J.D., the trial court stated that the parents should "continue to divide the time as near as possible to equally" because the trial court found that "[the children] have a very close relationship with their mother ... and it would not be in their best interest that we follow just the Court's standard schedule."
On August 3, 2017, the trial court entered its order memorializing its findings from the bench. Nicole filed a timely notice of appeal from this order.
IV. Standard of Review
We review child-custody cases de novo but will not reverse a trial court's findings unless they are clearly erroneous. Grindstaff v. Strickland , 2017 Ark. App. 634, 535 S.W.3d 661. Because the question whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial court to evaluate the witnesses, their testimony, and the child's best interest. Id. There are no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving minor children. Id.
V. Discussion
A. Existence of a Joint-Custody Arrangement
Arkansas Code Annotated section 9-13-101(a)(1)(A)(iii) (Repl. 2015) provides that in an action for divorce, an award of joint custody is favored in Arkansas. "Joint custody"
*8 means "the approximate and reasonable equal division of time with the child by both parents individually as agreed to by the parents or as ordered by the court." Ark. Code Ann. § 9-13-101(a)(5).
Nicole argues that the trial court erred in finding that a true joint-custody arrangement existed. She says that the term "joint custody," along with the term "primary residential custodian," is ambiguous on its face. We agree that the divorce decree's use of both terms is ambiguous, as did the trial court.
In Singletary v. Singletary , 2013 Ark. 506, 431 S.W.3d 234, the parties' divorce decree provided for "joint custody of the minor child" with the mother having "primary custody," while their property-settlement agreement provided for "joint legal custody" with the mother being "the primary physical custodian." Id. at 2, 431 S.W.3d at 236. The supreme court found that this language was ambiguous. When an ambiguity exists in a contract, the appellate courts are permitted to look outside the contract to determine the actual intent and conduct of the parties. Id. In arriving at the intention of the parties, the courts may consider and accord considerable weight to the construction of an ambiguous contract by the parties themselves, evidenced by subsequent statements, acts, and conduct. Id.
Here, J.D. testified that he thought joint custody meant that the parties had equal say in matters involving the children. Nicole said that she put the term "joint custody" in the agreement because J.D. would not have otherwise signed it but that she thought she had the final word and did not need either J.D.'s or the trial court's permission to move with the children. Despite their conflicting views on the meaning of the term "joint custody," the trial court determined that the parties shared joint custody because the division of time was approximately equal, with only a slight advantage in Nicole's favor. We agree with the trial court that this was a joint-custody arrangement.
B. The Hollandsworth Presumption
In Hollandsworth v. Knyzewski , 353 Ark. 470, 109 S.W.3d 653 (2003), the supreme court held that the relocation of a primary custodian and his or her children alone is not a material change of circumstances and that there is a presumption in favor of relocation for custodial parents with primary custody.
Nicole contends that the trial court erred in not applying the Hollandsworth presumption. She argues that her move to Viola from Cave City and the children's change of schools were not a material change of circumstances to justify awarding custody of the children to J.D.
In Singletary , supra , the supreme court clarified that the Hollandsworth presumption applies only in cases in which a parent has been granted sole or primary custody of a child and simply does not apply when the parents share joint custody of a child. In Cooper v. Kalkwarf , 2017 Ark. 331, 532 S.W.3d 58, the supreme court held that the Hollandsworth presumption should be applied only when the parent seeking to relocate is not just labeled the "primary" custodian in the divorce decree but also spends significantly more time with the child than the other parent. Id. at 15, 532 S.W.3d at 67. Here, Nicole did not spend significantly more time with the children, and because we hold that the parties shared joint custody, the trial court did not err in not applying the Hollandsworth presumption.
C. Relocation with a Joint-Custody Arrangement
The Singletary court recognized that the proper analysis for a court facing *9 a change-in-custody request due to relocation of one parent when the parents have joint custody was announced in Lewellyn v. Lewellyn , 351 Ark. 346, 93 S.W.3d 681 (2002), and is essentially the same as a change-in-custody analysis when relocation is not involved. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. Evans v. McKinney , 2014 Ark. App. 440, 440 S.W.3d 357. The reason for requiring more stringent standards is to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. Id. The party seeking modification of the custody order has the burden of showing a material change in circumstances. Id. In order to change custody, the trial court must first determine that a material change in circumstances has occurred since the last order of custody; if that threshold requirement is met, it must then determine who should have custody with the sole consideration being the best interest of the children. Id.
Nicole argues that, even if there was a joint-custody arrangement, her moving fifty-one miles from Cave City to Viola does not constitute a material change in circumstances. She presented testimony from A.D.'s speech pathologist and an accredited dyslexia interventionist that A.D. is making progress and that he needs the help he is currently receiving at the Viola School District. She contends that the Cave City School District did not make necessary changes for A.D. and that the availability of comparable services at Cave City was speculative at best. She contends that there was little evidence that J.D. had ever been seriously concerned with or involved in the education of his children. Nicole points out that M.D. testified that he likes the Viola School District better and wants to live in Viola with her. She asserts that there was no material change in circumstances, and even if there was, the record clearly shows that it was in the children's best interest to remain in her custody. She contends that the trial court's order is notable for its failure to even discuss the best interest of the children.
The trial court listed multiple changes in circumstances, but Nicole does not address the findings that she violated the trial court's order by living with Robby before they were married and that she lost her job in Batesville when she decided to have her tubal ligation reversed so that she could have children with Robby. Moreover, Nicole's pleadings below indicate that she thought her move, which involved getting a new job with better hours and enrolling the children in what she considered a better school district, was a material change in circumstances. She cannot now argue that there was no material change in circumstances. A party litigant is bound by his or her pleadings and the allegations therein and cannot maintain a position inconsistent therewith. See Morehouse v. Lawson , 90 Ark. App. 379, n. 3, 206 S.W.3d 295 (2005).
The polestar consideration in a change-of-custody determination is the best interest of the child, and the trial court should consider the following factors: (1) the reason for relocation; (2) the educational, health, and leisure opportunities available in the new location; (3) a visitation and communication schedule for the noncustodial parent; (4) the effect of the move on extended family relationships in the new location as well as in Arkansas; and (5) the child's preference, taking into account the child's age and maturity, as well as the reasons given by the child for the preference. Cooper, supra.
*10 The trial court addressed the children's best interest in its ruling from the bench but did not include specific factual findings in that regard in its written order. Tillery v. Evans , 67 Ark. App. 43, 991 S.W.2d 644 (1999) (recognizing that this court may presume that the trial court acted properly and made the findings necessary to support its judgment). The trial court's comments from the bench show that it considered the children's best interest. The trial court noted that the reason for Nicole's relocation to Viola was so that she could "foster her romantic relationship" with Robby and noted that there was no advantage to enrolling the children at the Viola School District because both school districts offered comparable services and were good school systems. Although M.D. seemed to prefer the Viola School District, his testimony suggested that it was because he did not want to play football at Cave City. J.D. testified that it was okay with him if either son did not wish to play sports, and the trial court apparently believed him. Also, there was testimony that the children's extended relatives reside in or near Cave City. The trial court further ruled that it was in the children's best interest that Nicole and J.D. continue to divide their time with the children as nearly equal as possible. Given our standard of review and the special deference we give trial courts to evaluate the witnesses, their testimony, and the children's best interest, we cannot say that the trial court clearly erred in reaching its decision.
Affirmed.
Harrison and Klappenbach, JJ., agree.

The trial court ordered Nicole and J.D., as well as both stepparents, to be drug tested. The results of those tests were negative.