Cite as 2024 Ark. App. 348

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-23-478

| | |
|---|---|
| AMANDA WELLS<br><br>APPELLANT<br><br>V.<br><br>AUSTIN WELLS<br><br>APPELLEE | Opinion Delivered May 29, 2024<br><br>APPEAL FROM THE BAXTER COUNTY CIRCUIT COURT [NO. 03DR-19-466]<br><br>HONORABLE RALPH WILSON, JR., JUDGE<br><br>REVERSED AND REMANDED |

## ROBERT J. GLADWIN, Judge

This is an appeal of the Baxter County Circuit Court's order modifying custody of the minor child ("MC") in favor of primary custody with the appellee Austin Wells ("Austin") and denying the request to modify the parties' divorce decree filed by appellant Amanda Wells ("Amanda") to allow her to relocate with MC to Kansas. Amanda argues on appeal that the circuit court erred by improperly placing the burden of proof on her to establish a reason for her relocation, and furthermore, the circuit court's finding that a change of custody was in MC's best interest was clearly erroneous. We reverse and remand.

## I. *Background Facts*

Amanda and Austin were divorced on or about February 11, 2020. The decree of divorce (the "Decree") stated that the parties would have joint custody of MC, who was two years old at the time. The Decree also included a visitation schedule that placed MC in

Amanda's care the majority of the time and gave Amanda decision-making authority over the child. However, Amanda and Austin agreed that they did not follow the visitation schedule set forth in the Decree. Testimony evidenced that Austin exercised minimal visitation with MC because he was on the road for his job and that it was not feasible to exercise his visitation. Furthermore, at the time of the temporary hearing—held on June 14, 2022—Austin was approximately $3,200 in arrears in child support. Austin admitted that Amanda frequently requested that he exercise more visitation with MC but that he was "in a very dark place, very angry, very hurt." When asked whether Amanda had been responsible for MC morning, noon, and night since the time of the Decree to the date of the temporary hearing, Austin responded, "For the most—most part. Yes sir."

While living in Mountain Home, Amanda was employed at El Charro and had worked in the restaurant industry for several years. She is in a long-term relationship with Diego Castro ("Diego"), who also worked at El Charro. Amanda and Diego have been in a relationship for over three years, and Amanda testified that before she filed her petition to modify the Decree and relocate with MC, Austin never expressed any concerns regarding Diego. Diego moved to Iola, Kansas, to work at an El Charro restaurant, and Amanda sought relocation to Iola as well to assist Diego at the restaurant. Amanda expressed other reasons for wanting to move away from Mountain Home—namely, negative experiences that stemmed her membership in the Jehovah's Witness congregation during childhood. Amanda recalled that after leaving the church, she was shunned by members of her family.

Amanda also has another child, MC2, from a previous relationship. MC and MC2 have been raised together as brother and sister. MC often spent time with MC2's paternal grandparents, Sheila and John Nicholson, who helped Amanda with MC while she was working. John Nicholson testified that he considers MC to be his grandchild and that even though MC2's father lives outside the United States, Amanda has kept him and his wife involved in MC2's life.

On March 7, 2022, Amanda filed a petition to modify the Decree seeking primary custody and permission to relocate to Iola, Kansas, with MC. She noted in her petition that Austin had moved an hour away from Mountain Home and was living in Cherokee Village. In response, Austin filed an answer and counterclaim that objected to Amanda's relocation with MC and sought full custody of MC with visitation for Amanda. In June 2022, Amanda moved to Kansas. She works at El Charro in Iola and testified that her schedule is more flexible than it was when she was a server in Mountain Home. Amanda testified that before she relocated with MC, she researched the school district in Iola, particularly the curriculum and class sizes.

The court held a temporary hearing in July 2022, and afterward, the circuit court entered an order denying Amanda's request to relocate and granting Austin temporary primary physical and legal custody of MC. In doing so, the circuit court found that the Decree was not a true joint-custody agreement but, rather, that Amanda had been the primary caregiver of MC. Accordingly, the court held that Austin had the burden to rebut the presumption in favor of relocation pursuant to *Hollandsworth v. Knyzewski*, 353 Ark. 470,

109 S.W.3d 653 (2003). The circuit court then weighed some of the factors identified in *Hollandsworth* and held as follows: (1) the reason Amanda sought relocation was to "be with her boyfriend"; (2) there were no educational, health, or leisure advantages for MC in Iola, Kansas; (3) visitation for Austin would be "difficult"; and (4) the move would adversely affect MC and extended family. Regarding the last two findings, the court held that they weighed "in favor of [Austin]."

On March 3, 2023, the circuit court held the final hearing. The parties both testified, and Amanda called three witnesses: Kim Marquez, Angela Rodriguez, and John Nicholson. Austin did not call any witnesses.

Austin testified that he now works as a full-time wrecker driver for Carter and Sons, Monday through Friday, from 8:00 a.m. to 5:00 p.m., and that his wife works as a 911 dispatcher. Austin testified that Amanda's boyfriend lives with her in Kansas and that he is an undocumented migrant from Mexico. He further testified that the visitation arrangement had been "pretty good" for MC since the temporary hearing and that MC had started counseling. Austin stated that Amanda handled all the transportation for visitation since the temporary hearing and had missed only one visitation. Austin, however, believes that he can "regulate" visitation better than Amanda. He acknowledged that Amanda had been flexible about visitation until she expressed her intention to move to Kansas and that he asked that visitation exchanges take place at the sheriff's office due to what Austin referred to as Amanda's "outbursts." Austin testified that his wife has four children who live with them, and he has a biological child whom he does not have contact with who was adopted

4

at the age of four.  Additionally, Austin testified to discord with Amanda regarding MC's seeing a doctor to determine whether she has ADHD and concerning a medication that MC started "to help her sleep."  Furthermore, Amanda is no longer able to have contact with MC's therapist, Gemma Holiman, because Amanda recorded a session that she had with Ms. Holiman in violation of confidentiality.

Next, John Nicholson—MC2's paternal grandfather—testified that Amanda is a great parent and that she discussed her potential move to Kansas before making the decision, and they were able to resolve any concerns John and his wife had regarding the possible effect the move might have on their relationship with the children.  John further stated that Amanda's move to Kansas had not negatively affected his relationship with MC2.  John did testify that MC2 has had a difficult time being away from MC. Angela Rodriguez—the ex-wife of Amanda's father—lived with Amanda when Amanda was a child and a young adult and testified to the negative effect the Jehovah's Witness religion had on Amanda's life and how she was shunned by the community (and her sister) after she left the church.

Amanda testified that Austin's visitation with MC was "hit or miss" after their separation and that she worked around his schedule so that he could see MC.  She testified to frequently asking Austin to spend more time with MC and stated that she even considered stopping this request "because it wasn't going well."  Amanda testified that she ensured MC had a good relationship with Austin's parents and that she frequently communicated with them regarding birthdays and events and sent them photographs. She acknowledged that she and Diego started seeing each other romantically in December 2019.  However, she alleged

that Austin never had any complaints about or concerns with her relationship with Diego until she told Austin that she wanted to relocate to Kansas with MC. She testified that Diego has been in the United States for approximately seventeen years but that he is undocumented.

When contemplating the move, Amanda maintains that she researched the Iola School District as well as the local parks, hiking trails, and pools. She testified that she and Diego live in a three-bedroom apartment and that MC has her own room. Furthermore, Amanda testified that she could make her own schedule at El Churro in Iola; therefore, she has more flexibility to attend after-school activities with her children.

On cross-examination, Austin's counsel questioned Amanda about some tattoos on Diego and asked why some of his tattoos were "suspicious." One tattoo of interest was what Amanda referred to as "the Mexican flag with the eagle with the snake," and she testified that some individuals who have that particular tattoo are associated with "Ciudad Juarez," which is a gang. Amanda further testified that Diego has no criminal history but acknowledged he was denied United States citizenship because of certain tattoos that can be associated with criminal activity. Austin's counsel attempted to introduce a governmental document to support this testimony; however, Amanda's counsel objected due to the age of the document, and the circuit court sustained the objection.

Finally, the attorney ad litem testified that she believed both parties are good parents with room for improvement in their co-parenting relationship. She shared no concerns about Amanda's residence in Kansas but stated that MC had been making progress with her

therapist, and she was concerned that progress would cease if she relocated to Kansas. The ad litem testified that she believed family therapy would be helpful to all involved and acknowledged MC2's desire to be with his sister. She further stated that she had not heard anything negative about Diego except that he was undocumented, which she stated had no bearing on her decision. She opined that it was in MC's best interest to remain in Mountain Home and for Amanda to have extended weekend visitation and liberal summer visitation. However, the ad litem recommended that Amanda and Austin should share joint custody of MC if Amanda moved back to Mountain Home.

At the conclusion of the hearing, the court again stated that this was not a joint-custody arrangement; thus, the *Hollandsworth* presumption applies. From the bench, the court made the following findings: (1) due deference was given to the attorney ad litem's recommendations; (2) the temporary order had no "precedential precedence"; (3) Amanda and Austin are both fit and proper parents; and (4) it had already found a material change in circumstances because Amanda relocated to Iola, Kansas, "to chase Mr. Castro" but added that the court was not "casting any dispersions" on Mr. Castro because he had never been a part of the proceedings. With regard to the *Hollandsworth* factors, the circuit court held that Amanda's salary was no better in Iola than in Mountain Home; Amanda's reason for relocating is not "good enough"; there was no benefit to living in Kansas over Mountain Home in regard to education, health, and leisure opportunities; and the effect of the move on extended family relationships would be a disadvantage because there are no familial

7

relationships in Kansas for MC. Accordingly, the court considered the fact that MC's extended family resides in Mountain Home "in favor of remaining [there]."

On March 31, 2023, the court memorialized its findings in a written order. The court held that Amanda "constructively had sole custody of MC," and there had been a change of circumstances sufficient to justify modification of custody because Amanda "moved out of state without sufficient justification." Furthermore, the court found that Amanda's reasons to relocate MC are "not justified"; thus, the court denied the petition to relocate and Amanda's request to be granted primary custody. Instead, the court held that Austin was to have sole physical custody, and Amanda was entitled to "extensive and liberal visitation" with MC. The court also set forth a visitation schedule. Amanda filed a timely notice of appeal of the final order, and this appeal followed.

## II. *Standard of Review*

In reviewing child-custody cases, we consider the evidence de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *McNutt v. Yates*, 2013 Ark. 427, at 8, 430 S.W.3d 91, 97. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Boudreau v. Pierce*, 2011 Ark. App. 457, at 11, 384 S.W.3d 664, 671. It is well settled that the primary consideration is the welfare and best interest of the child, while other considerations are merely secondary. *McNutt*, 2013 Ark. 427, at 8, 430 S.W.3d at 97. We give special deference to the superior position of the circuit court to evaluate and judge the credibility of the

witnesses, and this deference to the circuit court is even greater in cases involving child custody because a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*

### III. *Points on Appeal*

Amanda makes the following arguments on appeal: (1) the circuit court did not properly apply the *Hollandsworth* presumption in her favor, and (2) the circuit court's finding that a change of custody was in MC's best interest was clearly erroneous.

### IV. *Discussion*

For her first argument on appeal, Amanda maintains that the circuit court failed to properly apply the *Hollandsworth* presumption in her favor but, instead, placed the burden of proof on her to identify a reason for her relocation. We agree.

In determining whether a parent may relocate with a minor child, a circuit court must generally look to the principles set forth in *Hollandsworth*, 353 Ark. 470, 109 S.W.3d 653. In *Hollandsworth*, our supreme court pronounced a presumption in favor of relocation for custodial parents with sole or primary custody, and the noncustodial parent was given the burden of rebutting the presumption. *Id.* at 485, 109 S.W.3d at 663. This presumption, however, should be applied only when the parent seeking to relocate is not only labeled the "primary" custodian in the divorce decree but also spends significantly more time with the child than the other parent. *Cooper v. Kalkwarf*, 2017 Ark. 331, at 15, 532 S.W.3d 58, 67. In *Cooper*, the court explained that this standard preserves the rights of a primary custodian

when he or she has shouldered the vast majority of the responsibility for caring for and making decisions on behalf of the child, and it also more accurately reflects the best interest of the child, which is the polestar consideration in any custody decision. *Id.*

In *Singletary v. Singletary*, 2013 Ark. 506, at 8, 431 S.W.3d 234, 239, our supreme court clarified *Hollandsworth* and held that the presumption does not apply when the parents share joint custody of a child. Rather, the *Singletary* court recognized that the proper analysis for a court facing a change-in-custody request due to relocation of one parent when the parents have joint custody was announced in *Lewellyn v. Lewellyn*, 351 Ark. 346, 93 S.W.3d 681 (2002), and is essentially the same as a change-in-custody analysis when relocation is not involved. *Id.* at 9, 431 S.W.3d at 240.

Here, the parties' Decree stated that they would share "joint physical custody"; however, the custody agreement set forth in the Decree does not reflect joint custody. Instead, Austin was allowed visitation and ordered to pay child support to Amanda. Thus, the circuit court held that Amanda "constructively" held primary custody of MC. Neither party disputes the court's finding that Amanda has been MC's primary caregiver since entry of the Decree or that *Hollandsworth* applies. According to precedent, therefore, Amanda no longer had the responsibility to prove a real advantage to herself and MC in relocating. *Hollandsworth*, 353 Ark. at 485, 109 S.W.3d at 663. The *Hollandsworth* court recognized that divorce not only changes the relationship between parents but also inevitably changes the nature of the relationship between parents and their children. *Id.* at 476, 109 S.W.3d at 657. Importantly, *Hollandsworth* also made clear that "relocation alone is not a material

10

change in circumstance" for a custodial parent with primary custody. *Id.* at 485, 109 S.W.3d at 663.

On appeal, Amanda maintains that the circuit court erred in finding that a material change in circumstances existed on the basis of her relocation alone. In its final order—entered on March 31, 2023—the circuit court held that a change of circumstances sufficient to justify modification of custody had occurred because Amanda "moved out of state without sufficient justification." We hold that the circuit court's material-change-of-circumstance finding in the final order is directly contrary to *Hollandsworth*. Pursuant to precedent, Amanda's relocation to Kansas in and of itself is not a change in circumstances sufficient to modify custody; thus, the circuit court's order granting Austin sole physical custody of MC is reversed.

However, even if the circuit court had made a proper change-in-circumstances finding, we agree with Amanda that the court improperly shifted the burden to her to prove that relocation offered an advantage to MC rather than requiring Austin to rebut the presumption in favor of relocation. In recognizing the custodial parent's right to relocate with his or her children, the *Hollandsworth* court set forth the following factors to be considered in determining the best interest of the child in the matter of a request for relocation: (1) the reason for the relocation; (2) the educational, health, and leisure opportunities available in the location in which the custodial parent and child will relocate; (3) the visitation and communication schedule for the noncustodial parent; (4) the effect of the move on the extended family relationships in the location in which the custodial parent

11

and children will relocate as well as in Arkansas; and (5) the preference of the child, including the age, maturity, and the reasons given by the child as to his or her preference. *Hollandsworth*, 353 Ark. at 485, 109 S.W.3d at 663–64.

In its order denying Amanda's petition for relocation and modification of custody, the circuit court found that Amanda's reason for relocation was "not justified." At the final hearing, the court expressed from the bench that Amanda moved to Iola "to chase Mr. Castro" and that her reason for relocating "to get out of Mountain Home . . . isn't a good enough reason in my opinion." Throughout the proceedings, the court placed a heavy emphasis on Amanda's reason for wanting to relocate with MC; however, it is well-established that the custodial parent no longer has the responsibility to prove that relocation is advantageous. *See Hollandsworth*, 353 Ark. at 485, 109 S.W.3d at 663. At the close of the hearing, the court (1) stated that "the only family the minor child has is here [in] Arkansas, therefore the child shall remain in Arkansas"; (2) cited Amanda's testimony that her salary was not more in Iola than it was in Mountain Home; and (3) expressed that it did not "see any benefit in Iola, Kansas over Mountain Home" in terms of educational, health, and leisure opportunities.

In *Hartsell v. Weatherford*, 2012 Ark. App. 164, at 3, this court held that it was erroneous for the circuit court to deny the mother's request to relocate because "[i]t was obvious from the trial court's findings that it improperly required Hartsell to prove that her proposed relocation to California offered some material advantage." This court further held that the circuit court's misapplication of the law was evidenced by the court's finding that

12

the mother had not proved that the same opportunities she sought in California were unavailable in Arkansas or that the education and leisure activities were superior in California. *Id.* Similarly, in *Cox v. Cox*, our court found that the circuit court erred by improperly shifting the burden to the mother to prove that her proposed move to Canada would be advantageous to her and the children. 2019 Ark. App. 197, at 9–10, 574 S.W.3d 711, 716–17. This court further acknowledged in *Cox* that *Hollandsworth* presupposes that visitation and communication between the child and the noncustodial parent will be impaired, but if there continues to be meaningful visitation, then the presumption in favor of relocation is not rebutted. *Id.* at 11, 574 S.W.3d at 717. Therefore, this court reversed and remanded for entry of an order allowing the mother to relocate to Canada with the children. *Id.* at 12, 574 S.W.3d at 718.

A review of the circuit court's order and its oral statements at the close of the hearing leaves no doubt that the court placed the burden on Amanda to prove that her move to Kansas was advantageous or that Iola was "superior" to Mountain Home. However, *Hollandsworth* makes clear that, as the custodial parent, it was not her burden to carry. The presumption in favor of relocation is automatic. Amanda did not have to prove that her reason for relocating was "good enough" or "justified." Nor did she have the burden to show that the Iola school is more beneficial than the Mountain Home school; that she will make more money in Iola; or that Iola had more health advantages and leisure opportunities than Mountain Home. Amanda was afforded the presumption in favor of relocation, and nothing

13

more was required of her.  Austin, as the noncustodial parent, had the burden to rebut the presumption.

Applying the *Hollandsworth* factors to the evidence presented at the hearing, Austin unequivocally failed to rebut the presumption in favor of relocation.  First, Austin presented no testimony disputing Amanda's reasons for wanting to relocate.  Austin provided no testimony regarding the quality of the schools in either location; he likewise failed to provide any testimony regarding the availability of health opportunities in either location or to dispute the leisure opportunities available in Iola; he admitted that Amanda has been flexible with visitation arrangements for years, even during periods of time when he was not regularly exercising his visitation with MC; he acknowledged that Amanda had encouraged him to spend more time with MC; and he admitted that Amanda had ensured his parents saw MC regularly.  As to the circuit court's finding that MC has family only in Arkansas, we hold that the court entirely disregarded the close relationship MC has with MC2, the brother with whom MC has been raised.

From his testimony, Austin's primary concern with relocation is the negative effect it will have on his visitation with MC and the amount of time MC will spend with extended family.  However, *Hollandsworth* presupposes that visitation and communication between the child and the noncustodial parent will be impaired.  *See Fischer v. Smith*, 2012 Ark. App. 342, 415 S.W.3d 40.  Nevertheless, "if there continues to be meaningful visitation, the presumption in favor of relocation is not rebutted."  *Id.* at 8, 415 S.W.3d at 44.  Amanda testified that she would encourage regular visitation for Austin with MC; that she would be

14

willing to meet halfway to facilitate visitation; and that some weekends she could make the drive to Mountain Home. Additionally, Amanda testified to being flexible with Austin regarding visitation and scheduling thereof and further stated that she would extend the same courtesies moving forward.

Applying the law as set forth in *Hollandsworth*, we hold that the circuit court improperly shifted the burden to Amanda to prove that relocation to Kansas was advantageous and "justified." The fact that the court made no finding whatsoever in either the written order or from the bench that Austin rebutted the presumption in favor of relocation only reinforces this court's conclusion that the circuit court failed to properly apply *Hollandsworth*. While the court acknowledged in its July 5, 2022 temporary order that the *Hollandsworth* presumption applies—and that Austin carried the burden of rebutting the presumption—it is not enough for the circuit court to merely recite that the law applies. The rationale behind *Hollandsworth* was to preserve and protect the stability of the relationship between the child and the custodial parent with whom the child spends the majority of his or her time. *Singletary*, 2013 Ark. 506, at 8, 431 S.W.3d at 240. Therefore, statements made by the circuit court that certain factors weighed "in favor" of Austin, combined with the reasoning set forth above, leave this court with a definite and firm opinion that the circuit court committed clear error.

Having held that the circuit court erred in finding that Amanda's relocation constituted a material change in circumstance justifying modification of custody to Austin and that the circuit court improperly shifted the burden to Amanda to prove some advantage

15

to her relocation to Iola with MC, we need not consider the rest of Amanda's argument concerning the validity of the circuit court's best-interest finding.

## V. *Conclusion*

For the above-stated reasons, we reverse and remand for entry of an order allowing Amanda to relocate with MC to Iola, Kansas.

Reversed and remanded.

VIRDEN and HIXSON, JJ., agree.

*Bradley D. Hull*, for appellant.

*Robert S. Tschiemer* and *Darid R. Horn*, for appellee.