Rezona KELLY *v.* Donnie KELLY

78-187                                      575 S.W. 2d 672

Opinion delivered January 22, 1979
(Division II)

*Jim D. Spears,* for appellant.

*Jerry D. Pruitt,* for appellee.

JOHN A. FOGLEMAN, Justice. This is a divorce action in which appellant Rezona Kelly was granted a divorce in a suit against appellee Donnie Kelly. She asserts error in that portion of the decree awarding Mr. Kelly an interest in real property, the record title to which was in her and her mother, Wilma Styron. She also contends that the award of alimony and child support was totally insufficient. We find no reversible error.

The property in question was a lot on North 50th Street in Fort Smith. After the sale of a dwelling house owned by appellant and appellee as tenants by the entirety, appellant and her mother caused a house to be moved from either Booneville or Greenwood and placed on the lot on North 50th Street. The chancery court held that Mr. Kelly was entitled to credit for $1,753.25, stating that it represented one-half the money expended by the parties on this residence, but vested all other interest in the house and lot and the right of possession in appellant. Mr. Kelly first contended in the trial court that the title was held in a resulting trust of which he was the beneficiary. Mrs. Kelly argues that the divorce statutes do not provide for an award of property of the wife to the husband. She contends that the trial court did not declare a resulting trust, but merely imposed a lien on the property for the stated amount. We are inclined to agree with appellant that the decree should have merely given appellee a lien on the property to the extent of the amount fixed. Appellee contends here that the chancellor imposed a lien on the property for the amount stated to be paid when and if the house is sold in the future. We are unable to find these provisions in the decree, but take the record of the chancellor's findings and the decree to indicate such an intention.

Mrs. Kelly asserts that there cannot be a resulting trust because appellee did not furnish the entire purchase price for this property, relying on *Gordon v. Claridy,* 142 Ark. 184, 218 S.W. 195. She is correct in this contention, since we cannot say that it was shown by clear, cogent and convincing evidence that, before the title vested, Kelly paid or advanced

moneys on the basis of an agreement between the parties that he was to have a definite interest or a determinate aliquot part of the property, or that he should own an interest in the land corresponding to the amount contributed by him. *Harbour* v. *Harbour*, 207 Ark. 551, 181 S.W. 2d 805.

There is evidence, however, that Kelly made substantial advancements for the house and for other improvements on the lot. The parties had jointly owned a house in which they resided, which was sold and at least part of the proceeds invested in the purchase of the house that was moved. This appears to have been accomplished by repayment to Mrs. Styron, who advanced at least $10,600 on the purchase of the house that was moved onto the lot and for necessary expenditures in improving it. The amount repaid to her is disputed. A part of this repayment came from a $2,000 deferred purchase money note of the buyers of the house the parties had jointly owned, at the rate of $50 per month. These payments have been and are being made directly to Mrs. Styron, beginning in February or March, 1975. Appellee testified that he had paid $100 per month from his salary on the debt to Mrs. Styron from February 1975 through October 1977. Mr. Kelly testified that a two-car garage had been built on the property at a cost of approximately $2,500, that he had paid $600 for carpet, $300 for repair of a porch and patio, and a minimum of $500 for paneling. He stated that $4,500 of the proceeds of sale of the jointly owned house also went to Mrs. Styron, but admitted that it might be true that she received as little as $1,763.50. In addition, it is admitted that he performed some labor in improving the house, even though appellant attempted to belittle the extent and value of that work.

Mrs. Styron testified that she received around $1,700 from the proceeds of sale of the house jointly owned by her daughter and son-in-law. She did not contradict appellee's testimony about other payments. Mrs. Kelly testified that the $1,700 went for a stove and dishwasher. According to her, the total payments to her mother amounted to $3,506.31. Her testimony that a part of this money came from her unemployment compensation check of $94 per week is not very satisfactory or convincing. She denied that $2,500 was invested in the garage, $600 in carpet and did not know about

the cost of the repair of the porch and patio, but, for some reason not made clear, claimed credit for one-half of that expense. To say the least, there is clear and convincing evidence that Mrs. Styron has been paid $3,506.31. The findings announced by the chancellor indicate that she arrived at the amount allowed appellee by taking one-half of this admitted total payment.

Appellant relies upon the presumption that any contributions by a husband to improve his wife's property are a gift to the wife, citing *Fine* v. *Fine,* 209 Ark. 754, 192 S.W. 2d 212. She recognizes however, that this is a rebuttable presumption, citing *Stephens* v. *Stephens,* 226 Ark. 219, 288 S.W. 2d 957. In this case, we are unable to say that the chancellor erred in finding that the presumption had been rebutted.

The parties had owned and lived in two residences jointly. Mr. Kelly testified that the money paid on these houses was his. He said that he did not consent to buy and move the house to the lot on North 50th Street at first, but eventually did agree to move there after the house had been moved. He said that he insisted, but that Mrs. Kelly never agreed, that the title to the property be put in their joint names when the indebtedness on the house was paid. He said that she first agreed, but later refused, saying that he made her feel insecure. Mr. Kelly said that he had not demanded that title to the property be placed in their joint names at the very outset, because he did not think it would be right to do so when they owed appellant's mother so much for the purchase of the house and the cost of moving it. Appellant had been employed when the parties were married, but had voluntarily left her employment before the house was moved. Appellee had insisted that she go back to work, but she refused, at least until their children were older. Mrs. Kelly denied that he had made any such request.

We find the evidence sufficient to rebut the presumption of a gift. It is quite clear that this case is somewhat different from those in which the husband pays the purchase price for property but causes the title to be taken in the wife's name or in their joint names. This case is, as appellant recognizes, governed by cases in which the husband has advanced or ex-

pended money in improving the wife's property, such as *Spruill* v. *Spruill,* 241 Ark. 808, 410 S.W. 2d 606. In such cases, this court has found the presumption to be rebutted when the evidence shows that not to do so would violate the principles of equity and good conscience. *Stephens* v. *Stephens,* supra; *Spruill* v. *Spruill,* supra. Here, as in *Spruill,* appellee took no action toward putting the title to the tract in his wife. Even if he had done so, the presumption might be rebutted on consideration of evidence of antecedent or contemporaneous declarations and matters fairly connected with the transaction or facts which existed so soon thereafter as to form part of the transaction. *Della* v. *Della,* 98 Ark. 540, 136 S.W. 927; *Poole* v. *Oliver,* 89 Ark. 578, 117 S.W. 747; *Johnson* v. *Johnson,* 115 Ark. 416, 171 S.W. 475; *Parks* v. *Parks,* 207 Ark. 720, 182 S.W. 2d 470.

We recognize that the presumption of gift can be overcome only by clear and convincing evidence. *Fine* v. *Fine,* supra; *Smith* v. *Smith,* 227 Ark. 26, 295 S.W. 2d 790. We also recognize that appellant testified that Mr. Kelly never requested that title be put in the joint names of the parties. But it is not necessary that evidence be undisputed in order to be clear and convincing, if found by the fact finder to carry a clear conviction to the mind. *In re Estate of Fickert,* 461 Pa. 653, 337 A. 2d 592 (1975); *Brown* v. *Warner,* 78 S.D. 647, 107 N.W. 2d 1 (1961). See also, *Cromwell* v. *Hosbrook,* 81 S.D. 324, 134 N.W. 2d 777. Evidence by a credible witness whose memory of the facts about which he testifies is distinct and whose narration of the details thereof is exact and in due order and whose testimony is so clear, direct, weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the facts related is clear and convincing. *In re Estate of Fickert,* supra. This measure of proof lies somewhere between a preponderance of the evidence and proof beyond a reasonable doubt. *Brown* v. *Warner,* supra; *Alexander* v. *Warren, Arkansas, School District No. 1 Board,* 464 F. 2d 471 (1972). It is simply that degree of proof which will produce in the trier of fact a firm conviction as to the allegation sought to be established. *Brown* v. *Warner,* supra.

We cannot say that the testimony of appellee was not clear and convincing, especially in view of the fact that the chancellor did not see fit to make any allowance to appellee

for any expenditures, except one-half of the credits on the indebtedness to Mrs. Styron, but, concededly there were additional items paid by someone. It appears to us that it would be contrary to equity and good conscience to deny appellee any recovery of the sums advanced under the circumstances prevailing here. This seems particularly true when we consider Mrs. Kelly's testimony that she had to fight appellee to get the jointly owned house sold, that he was hollering for a divorce at the time they were acquiring the house which was moved, and, in spite of appellee's demands, she had told him she didn't intend to ever go back to work again.

Although we feel that allowances for alimony and child support were conservative, we cannot say that the chancellor abused her discretion in making these allowances. Alimony was fixed at $150 per month until appellant remarries and the court allowed $100 per child per month as child support. The ages of the children were 5-1/2 and 2-1/2. The court also ordered that appellee pay $150 per month on the indebtedness on appellant's Thunderbird automobile, until that debt is fully paid. Appellee is also to be responsible for all extraordinary medical and dental bills. Appellee is employed as a brakeman-conductor by Missouri Pacific Railroad Company. His gross income in 1977 was $26,-259.20. $5,524.90 was withheld for federal income tax, $1,-167.34 for state income tax and $965.28 for railroad retirement. He said that he would receive a $2,000 refund on the federal tax. Appellee testified that his weekly "take-home" pay was $317. Appellant calculates this at $365.38 after the income tax refund. Appellee testified that he had worked two to four hours overtime six days per week and had made himself available for work six or seven days per week. He said that quite a bit of this work was "on the road" and that entailed additional expense. He also stated that the overtime work had "dropped off." He hoped to keep working on the same shift so he could have every other weekend off for visitation of his children. The court allowed him visitation on the first and third weekends each month from 6:00 p.m. Friday to 6:00 p.m. on Sunday. He owed $200 on a 1960 model Volkswagen. He pays $35 per week for support of two children by a previous marriage. He pays $130 per month for an efficiency apartment and also pays the utility bills.

Appellant is employable. When she and appellee were married she was employed by a finance company at a salary of $500 per month. Later she was made manager at a salary of $725 per month. She was also paid a 25 percent commission which had ranged from $17 to $100 per month. She continued working until three weeks prior to the birth of her first child. She also has a current beautician's license, but would probably need additional training on modern techniques before she could serve as a beauty operator.

Appellant says that she cannot take employment because it is necessary for her to remain at home to care for her youngest child. Dr. Jim M. Post has treated this child, Jason Allen Ray Kelly, since the child was born. He had seen the child twelve times for illnesses during 1977. Jason has had repeated ear infections since he was three months old. He has also had respiratory infections. His problems result from a deficit in immunogenicity, which predisposes him to infection, because he doesn't have a great deal of natural defenses. His ear infection is treatable. He was well at the time of the trial, according to the doctor. He had been subjected to surgery, but had not been hospitalized over a twelve month period except for a 24-hour period in December, 1977, when ventilating tubes were put in his ears. It was the opinion of the doctor that Jason could be left in the care of a competent babysitter, i.e., a person able to give medicine to the child and who was not caring for a number of children. He did not know of such a person who was available, but did have child patients who were being cared for by such persons. He did not know the cost of employing such a person. He did not mean that this should be a practical nurse. During periods of approximately three months in duration, any babysitter could care for him. Medication was usually administered over a seven to ten-day period. The doctor expected Jason's condition to improve, as the older child's had. Dr. Post said that Jason's speech development was delayed, probably because of his ear trouble, but admitted that the child could have "lay away speech." He felt that the best person to take care of a child is his mother and that a mother's love and presence are better for a child when it is ill.

Mrs. Styron had been staying with her daughter. She said that Jason's condition required all his mother's time. She

said that he had chicken pox but that his general health was good. She stated that he could not talk at all. Mrs. Kelly testified that Jason was not well for more than two or three weeks at a time.

Appellee testified that the inability of Jason to talk and his other ills had been exaggerated, and that he could say a few words. According to him, the child has to be challenged to talk and will respond to a challenge. He said that Jason was as bright as any child except for his speech impediment. Mr. Kelly testified that he did not speak until he was six years old and that Jason's handicap was hereditary, adding that one of the child's physicians had mentioned this possibility. He said that both children seemed spry and perky when they visited him and he did not know of any problems that Jason had experienced during the preceding months. He said that Jason could do a pretty good job of skating.

The situation here is such that even a slight change in any of the circumstances considered in arriving at the amounts fixed for child support would call for an increase. We also recognize that it is sometimes difficult to find the line of demarcation between ordinary and extraordinary medical expenses. Because of Jason's immunogenic deficiency, his hearing problem, his respiratory allergies, and his delayed speech impediment, we feel certain that the chancellor considered almost any medical expense related to these unusual physical conditions to be extraordinary. We have considered these medical expenses as extraordinary in holding that there was no abuse of discretion in fixing the amount of child support.

The decree is affirmed, but the cause is remanded for amendment of the decree to specifically fix a lien on the property according to our view of the chancellor's intention.

We agree. HARRIS, C.J., and HOLT and HICKMAN, JJ.