Cite as 2026 Ark. App. 151

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-24-47

| | |
|---|---|
| | Opinion Delivered March 4, 2026 |
| MADIHA SHAHID<br>    APPELLANT/CROSS-APPELLEE | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTEENTH DIVISION<br>[NO. 60DR-20-2357] |
| V. | |
| ASIF MASOOD<br>    APPELLEE/CROSS-APPELLANT | HONORABLE SHAWN J. JOHNSON, JUDGE<br><br>AFFIRMED IN PART AND REVERSED AND REMANDED IN PART ON DIRECT APPEAL;<br>AFFIRMED ON CROSS-APPEAL |

**CASEY TUCKER, Judge**

Appellant Madiha Shahid (Shahid) appeals an amended decree of divorce entered on September 27, 2023, granting her a divorce from Asif Masood (Masood).[1] On appeal, she argues that the circuit court erred in (1) its determination of Masood's child-support obligation by miscalculating his income; (2) its award of $5,000 a month in alimony to Shahid for seven years; (3) finding that Shahid did not rebut the presumption that joint

---

[1]This is the second appeal in this case. The first appeal, CV-22-106, was from a decree dated October 27, 2021, which was dismissed without prejudice for lack of a final, appealable order. *Shahid v. Masood*, 2023 Ark. App. 166. In this second appeal from the amended decree dated September 27, 2023, we ordered rebriefing because the parties failed to provide a sufficient statement of the case. *Shahid v. Masood*, 2025 Ark. App. 370. The parties timely rebriefed the case.

custody was in the best interest of the children; **(4)** finding that Shahid was in contempt; and **(5)** failing to find Masood in contempt for his failure to voluntarily pay the parties' joint tax debts.

Masood cross-appeals, arguing that the circuit court erred in awarding Shahid $5,000 a month in alimony for seven years, even if Shahid were to remarry, in contravention of Ark. Code Ann. § 9-12-312(a)(2) (Repl. 2020).

I. *Statement of Facts*

The parties were married on November 9, 1997, and they separated in July 2020. On July 23, 2020, Shahid filed a complaint for separate maintenance against Masood, which was converted to a complaint for divorce. Shahid and Masood have three sons. At the time of the divorce, two of the sons were adults and one was a minor (MC). Shahid sought custody of MC, child support, spousal support, and possession of the marital home. Masood filed an answer and his own counterclaim for divorce. He sought joint custody of MC and for an equitable division of the marital assets and debt.

On November 23, 2020, the trial court entered an agreed temporary order granting temporary custody of MC to Shahid subject to Masood's visitation. Shahid was granted exclusive use of the marital home with Masood responsible for paying the mortgage and utilities in addition to paying up to $3,000 a month on a credit card issued to Shahid.

In addition to some initial discovery disputes, Masood filed a motion for contempt on March 4, 2021. He alleged that Shahid gave jewelry to a third party to hold and sell, took MC out of the state, made disparaging remarks about him to the children and others in the

2

Pakastani community, continued a pattern of trying to purposefully alienate him from the children, created significant debt using other resources than the credit card identified in the agreed order, and blocked his phone number to prevent necessary communication. Shahid generally denied the allegations.

## A. The First Appeal

A trial was held on August 3 and continued to September 21, 2021. This trial was treated and scheduled as the final divorce hearing. Shahid testified that she had been married to Masood since she was seventeen years old for a total of twenty-three years. Masood is her cousin, and she was "promised to him without [her] consent." She said that this was common in Islamic culture. She said that Masood told her if she got a job, she could only work between 9:00 a.m. and 3:00 p.m., as she needed to take the children to school, pick them up, and not neglect her home duties. She only did volunteer work from 2015 until 2021. Shahid also testified that as a Pakistani wife she was expected to manage the home, cook, clean, raise the children, and be a dutiful wife. She said Masood was happy with her when she was taking care of the house, but things had changed after she returned to college. She obtained a bachelor's degree from UALR in business management in 2015.

Shahid testified that she filed for separation after Masood told her that she was welcome to live in the home as the mother of his children but not as his wife. She stated that Masood hired a private investigator to take pictures of her and a male friend on multiple occasions when they were visiting at night. She stated that the pictures were shown to others

3

in their community, and as a result, she had been ostracized. She further testified that she had lost friends and resigned from a board because of the pictures Masood had displayed.

She wanted to relocate to Virginia with MC to be closer to the parties' two adult children because she had been shamed in her community in Little Rock. Shahid wanted custody of MC because she did not think that she and Masood could co-parent. Shahid said that she had been MC's primary caregiver throughout the marriage since Masood was working. She further claimed that Masood had bullied their adult sons during the pendency of the divorce. Shahid stated that Masood was "manipulative and abusive" but had not been physically abusive to her. However, she said that Masood had been physically abusive to their adult middle son--who is on the attention deficit disorder spectrum--by hitting him on his back or pulling his ears when he was in seventh or eighth grade. Shahid acknowledged that she had never seen Masood do anything to MC.

Shahid explained that the parties maintained a comfortable lifestyle during their marriage, and all their friends were doctors. During the marriage they enjoyed taking overseas vacations, buying expensive clothing and furniture, and sending their children to a private school. They enjoyed helping their adult children with their education and expenses. Shahid asked that she be awarded spousal support and child support. Shahid claimed that in 2020, Masood's gross income was $675,405, and his net income was $524,825. She asked that Masood be ordered to pay her $25,000 a month for life in spousal support because he had "taken away all of the possibilities [she] had [and she had] sacrificed a career[.]" She was forty-three years old at that time.

On cross-examination, Shahid denied having sexual relations with her male friend, Dr. Wagas. However, she admitted that she would see him sometimes in the middle of the night and had kissed him. When she went out at night to see Dr. Wagas, she left MC at home with one of her other sons. She said her sons did not know about her relationship with Dr. Wagas. Despite claims that she had been ostracized by her community, Shahid admitted going to events in the community, including dances. She wanted to be able to move to Virginia with MC away from the environment where his mother has been characterized as an adulterer. She admitted that she had failed to take the TransParenting class that had been ordered by the court to assist with co-parenting. Shahid's AFM reflected that she had monthly expenses in excess of $24,000. She listed a personal loan of $20,000. She said that she also had taken out debt on other credit cards because she needed more than the $3,000 a month per the agreed order. She said that her children had "co-cards that they use for their personal expenses as well."

Dr. Sara Tariq, Shahid's friend and medical doctor, testified that she is close friends with Shahid. She described the Pakistani community as "tightknit." Dr. Tariq noticed that since Shahid's separation from Masood, Shahid has had a lot of anxiety. She explained that in her culture "when a woman gets divorced, unfortunately, no matter how educated or wealthy the community, the blame tends to go on the woman." Dr. Tariq stated she had no parenting concerns as to Shahid. She admitted on cross-examination that she had had no interactions with Masood since the separation.

Huma Sheikh testified next on behalf of Masood. Sheikh testified that she had been close friends with Shahid and Masood since 2007. Their families knew each other in Pakistan. She testified that Masood is a wonderful father and that there was never any strain in Masood's relationship with his children before the separation. She denied that she ever saw Masood be controlling of Shahid; instead, she said Shahid would dictate to Masood. She testified that on one occasion, she overheard Shahid telling Masood whether he was allowed to play sports with Sheikh's husband.

Masood testified that he was a hematologist oncologist. Since February 2020, Masood, through his solely owned corporation, Hematology Oncology Associates, PA (the "Corporation"), had been a 1099 independent contractor with Jefferson Regional Memorial Center (JRMC). He explained that over the years he had incurred a lot of financial losses and that he had worked double jobs, working until 7:00 p.m. to meet their household expenses. Since the separation, he had been living in a one-bedroom apartment near the parties' marital home.

Masood testified he received regular compensation through the Corporation of $62,471.50 a month. Masood reported on his AFM that his biweekly gross income was $21,533.77 ($46,656.50 a month). Masood attached a calculation sheet explaining that from his business income of $62,471.50 a month, he subtracted $16,815.00 in business expenses,

resulting in a total monthly income of $45,656.50.[2] Masood testified that his total monthly expenses, which included $3,000 to Shahid in temporary support, were $45,137.00. Masood's accountant had prepared a 2020 joint tax return that was admitted into evidence. However, the return was not filed because Shahid had not signed it yet. According to the 2020 joint tax return, the parties' adjusted gross income was $675,405, or $56,283.75 a month.

Masood denied that he was controlling or that he had ever prohibited Shahid from pursuing her education or working outside the home. He further testified that he took the co-parenting class as ordered and had tried to co-parent with Shahid. Masood requested joint physical and legal custody of MC and that alimony be given only for a certain time if required.

Masood was cross-examined about the three figures that had been provided for his monthly income: $46,656.50 on the front page of the affidavit, $45,656.50 on the attached calculation sheet, and $43,656.50 included on exhibit 3.[3] Masood stated that his correct monthly income after business expenses was $45,656.50. Upon further questioning, Masood testified with respect to the discrepancy between his income on the AFM and on the tax returns:

---

[2]Masood's attached calculation sheet reports total monthly income of $45,656.50, however, the front page of his AFM lists monthly income of $46,656.50, which leaves an unexplained discrepancy of $1,000.

[3]The record is void of Masood's exhibit 3, but it is not relevant considering Masood testified that it was not his correct monthly income.

7

Q. Can you explain to me the difference of the, the deposits into your bank account versus the amount you came up on Defendant's Exhibit Number Two?

A. Yes, ma'am. If you look at that Exhibit Number Two of the very top line, that's a gross business income. That is exactly what your total, there's no tax.

Q. Okay. So, your position is that these loans, what is this Simmons loan for?

A. Ma'am, these are the loans that, you know, I have incurred, you know, And, unfortunately, you know, I was unable to pay them off because, you know, I had to bring a big chunk back home to pay, you know, the home expenses.

Q. What did you purchase with the loan monies from Simmons Bank?

A. It's not that I purchased anything, ma'am. But unfortunately, if you are in this business of hematology oncology, over a period of years, the drug cost have gone up so sky high. To give you just one example, you may have seen those ads in the TV, Keytruda or OPDIVO, you know, those, just one vial of that drug for one patient is $10,000 to purchase.

Shahid was re-called as a witness. She admitted to blocking Masood's phone number and said she did so because he is "emotionally abusive" to her in text messages. She also admitted that although Masood attempted to have a dialogue about a bullying issue MC had at school, she refused and instead told Masood that she was handling it.

The circuit court sent a letter opinion to the parties on September 29, 2021, and it entered a divorce decree on October 27, 2021 ("2021 Decree"). The decree granted the divorce. It awarded joint physical and legal custody of MC, but designated Shahid as the final decision-maker for educational and extracurricular activities and Masood as the final decision-maker for major medical matters. The court awarded child support of $1,518.22,

awarded monthly alimony of $5,000 to Shahid for seven years, and divided the parties'

marital property and debts. Importantly, the 2021 Decree imputed a monthly minimum

wage of $1,906.67 to Shahid and found that Masood's monthly income was $43,656.50 per

his AFM.

Shahid appealed and Masood cross-appealed, which we remanded without prejudice

for lack of a final, appealable order. *Shahid v. Masood*, 2023 Ark. App. 166.

## B. Post First Appeal

Subsequently, the parties filed various motions but for purposes of this appeal, we

discuss only the relevant motions and orders concerning the issues on appeal. On April 27,

2022, Masood filed a motion to modify spousal support and child support on the basis that

Shahid obtained a job that paid significantly more than the imputed income the circuit court

imposed.

On October 31, 2022, Masood filed a motion to compel Shahid to comply with

discovery, and Shahid filed a motion to quash deposition and for protective order. An

agreed order was filed on December 15, 2022, regarding some of the discovery issues. That

order stated in pertinent part:

4.      [Shahid] shall produce to [Masood] the following documents by January
        6, 2022:

a.      Bank of America account statements, including deposit images, from
        September 1, 2021 through the most current statement;

b.      Regions account #0312 statements, including deposit slip images and
        check images, from September 1, 2021 through the most current
        statement;

9

c.     Regions account #9853 statements, including deposit slip images and check images, from September 1, 2021 through the most current statement;

d.     Regions account #3341 statements, including deposit slip images and check images, from October 1, 2021 through the most current statement;

e.     All deposit slip images and check images from Regions account #6643 from September 1, 2021 through the most current date;

f.     Citi credit card statements from September 1, 2021 through the most current date.

On January 26, 2023, Shahid filed a motion for contempt and for other relief due to harassment and abuse of process by Masood. She alleged that Masood had not paid the parties' tax debt.

Also on January 26, Masood filed a motion for contempt. He alleged that despite the circuit court's agreed order, Shahid admitted in her deposition that she had failed to disclose five additional accounts in her discovery answers. She further claimed in deposition that she was unable to remember the source or reason for deposits totaling over $75,000 in October 2021.

On February 10, Shahid filed a response to Masood's motion for contempt and a countermotion to increase alimony. She objected when asked to give details about some of the accounts because she thought they are "not relevant to the pending issues, so there was no failure to identify the accounts since a proper objection was made." She stated that she had looked at deposit images to provide further detail, but she was only able to give general

10

answers about the deposits made in her account and could not recall specific information. Shahid stated that she was not willfully failing to comply with some of the requests because she was still waiting for Regions Bank to provide her with some documents and she could only provide what she had in her possession. Overall, she asked that the motion for contempt be denied.

Regarding Shahid's countermotion for an increase in alimony, she alleged that even with her gainful employment, her monthly gross income of $11,595.47 was inadequate to cover her monthly expenses of $14,505. She stated that she expected her expenses to increase because she was planning to start a graduate degree program in fall 2023. Shahid acknowledged Masood's deposition testimony that his Corporation had entered into a new employment contract resulting in a reduction of his income. But, Shahid argued the reduction was voluntary and fully within his control. Because she alleged Masood had the ability to pay her at least an additional $2,910 a month, she argued that her alimony should be increased.

An agreed order was filed on May 10 regarding the missing discovery documents in Masood's contempt motion. The circuit court found that the remaining documents were produced on May 8—after the May 6 production deadline. However, it reserved the issue of whether Shahid was to be held in contempt and any "repercussions of that shall be reserved for the final hearing in this matter." After our mandate issued in *Shahid v. Masood*, 2023 Ark. App. 166, which was filed on April 20, 2023, and upon Masood's motion for leave to present evidence, the circuit court held a hearing that resulted in an order filed on May 11 regarding

11

whether the record was still open after our mandate. The circuit court stated the following

in relevant part:

> In the October 27, 2021 Decree, the Court did not specifically address certain accounts that were held by the parties. Additionally, more financial accounts have been discovered since the entry of the Decree on October 27, 2021. Given the posture of this case after dismissal from the Court of Appeals, the Court held a conference with the attorneys to determine a path forward.
>
> Plaintiff Madiha Shahid argues that the record should remain closed and that, pursuant to Rule 59, Defendant Asif Masood waived any argument regarding the financial accounts discussed on the original trial record. In response, Defendant Asif Masood argued that since the October 27, 2021 Decree was not final the record never closed. Consequently, the record remains open for further factual development. The Court notes that Ark. Code Ann. §9-12-315(a)(3)(A) states that "[e]very such final order or judgment shall designate the specific real and personal property to which each party is entitled." The Court of Appeals held that the October 27, 2021 Decree was not a final order because it did not dispose of all property.
>
> Accordingly, the Court finds that the record remains open to issues that regard outstanding financial accounts – both known and unknown – that the parties shared during their marriage. The parties are allowed to conduct discovery regarding the financial accounts in accordance with the Court's February 14, 2023 Scheduling Order. Additionally, the Court reserves the issue of the retroactivity of the division of marital property and its effective date.

C. Second Trial and Amended Decree

The circuit court held a final hearing on August 2, 2023. At the beginning of the

hearing, the circuit court denied Masood's motion in limine to prohibit the testimony of

Shahid's expert witness, Tracy Fox, a financial expert.

Masood testified that he entered into a new contract on November 1, 2022, with JRMC, and a copy was entered into evidence.[4]  The contract includes an annual draw of $58,000 (paid monthly at the rate of $4,833.33); a minimum productivity compensation of $420,000 per year (paid monthly at the rate of $35,000); and a process for an annual reconciliation, which would not occur until the close of the contract year, November 2023, payable to the Corporation.  Masood's AFM reflected that the Corporation distributed monthly income of $39,832 to Masood, individually, based on the new contract, without accounting for the annual reconciliation that had yet to occur.  He explained that his income was reduced for several reasons, including the fact that he previously was working two jobs to pay for Shahid's lavish lifestyle, he was getting older, and he was sharing joint custody and needed to be there to care for his child.  Masood testified that he was living modestly by renting a place for $1,650 a month and trying to pay the parties' marital debt as ordered.  He asked that spousal support and child support be modified retroactive to the date of his motion to reflect that Shahid's income had increased and his decreased. His work hours included seeing patients from 8:00 a.m. to 5:00 p.m. Monday through Thursday and Friday he handled administrative duties.

Regarding Masood's contempt motion, he asked the court to hold Shahid in contempt for failing to comply with the circuit court's order regarding her failure to timely

---

[4]Masood's initial testimony was that he personally entered into the contract with JRMC; however, the parties to the contract were the Corporation and JRMC.

13

provide discovery documents and that he be awarded attorney's fees he incurred as a result of her contempt.

Initially, Masood testified that he had paid off the 2020 tax debt, but he later admitted that it had not been paid off yet because he was paying other loans first and there was not a timeframe ordered in the decree.

Raymond Tracy Fox, a CPA, testified on Shahid's behalf. Fox stated that he calculated Masood's gross monthly income to be $55,684 based on Masood's 2021 and 2022 tax returns, which were admitted into evidence along with the Corporation's tax returns. Fox reported the history of Masood's income on his tax returns included $743,162 in 2021, and $593,242 in 2022. Fox did not include any income from 2023 in his calculations, but he reviewed profit-loss and income statements from the Corporation, which "there were things on there that I felt weren't correct, the interest expense was rather high for the level of debt, there's depreciation expense and there wasn't an asset to be depreciated." Adding the four months of 2023, it would bring the average down to around $53,300 in Fox's opinion. He acknowledged that the income in 2023 was lower than in 2022.

Shahid testified that since the 2021 Decree, she became employed by UAMS. She submitted a revised AFM reporting a monthly income of $5,071 from her employment. After receiving child support and alimony, her monthly income was $11,595.47, which was still less than her monthly expenses, which totaled $14,505.56. Shahid admitted that included in her monthly expenses were the expenses of the parties' two adult children, one who graduated college and is looking for a job and the other who is still in college.

14

Regarding Masood's motion for contempt against her, Shahid stated that she thought she gave a full and complete production of the documents required. She explained that she had difficulty obtaining deposit images online and had to request assistance from Regions Bank. She admitted that she had overlooked another account that had slipped her mind, and she provided that account's information once she received a letter asking for the information. Therefore, Shahid claimed that she tried to comply as best as she could and did not willfully refuse to provide any documents that she did not have in her possession at the time. She did not produce all the documents until May 2023.

Shahid discussed her motion for contempt against Masood. The messages between Masood and Shahid on the OurFamilyWizard app were entered into evidence without objection. Shahid admitted that although Masood had not paid off all the marital debt, he had started paying a "little bit." Although she admitted that there was an attempted charge on her behalf on one of Masood's credit cards after the divorce, she complained that Masood should be in contempt for "abuse of process" because Masood messaged her that future use of the card could be considered fraud.

At the conclusion of the hearing, the circuit court announced its oral findings. On September 27, 2023, the circuit court filed an amended decree of divorce that stated the following in relevant part to this appeal:

2.    Wherein; this matter was originally resolved by Decree of Divorced [sic] entered on October 27, 2021. The Arkansas Court of Appeals determined the Decree did not resolve all of the property of the marital estate and remanded the Decree back to this Court for final resolution. Between the time of the Decree and the final hearing, the Parties have

15

each filed new Motions to be resolved by this Court. This Decree is meant to be [sic] amend and substitute the original Decree, as well as resolve the outstanding Motions of the Parties to be a final resolution to this litigation.

. . . .

4.   The Parties have three children, two of which have reached the age of majority with one child remaining a minor. The Parties shall have joint legal and physical custody on a week-on, week-off basis, exchanging physical custody at the close of school day on Fridays. For any exchanges that do not take place after school due to the child not being in school the day of the exchange, the Party receiving the child shall pick up the child . . . from the other parent.

. . . .

6.   As amended in 2021, Ark. Code Ann.§ 9-13-101(a)(1)(A)(iv)(a) provides that in "an original child custody determination in a divorce or paternity matter, there is a rebuttable presumption that joint custody is in the best interest of the child." This presumption may be rebutted "[i]f the court finds by clear and convincing evidence that joint custody is not in the best interest of the child." Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)(b)(1). Clear and convincing evidence is:

[e]vidence by a credible witness whose memory of the facts about which he testifies is distinct and whose narration of the details thereof is exact and in due order and whose testimony is so clear, direct, weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the facts related is clear and convincing . . . This measure of proof lies somewhere between a preponderance of the evidence and proof beyond a reasonable doubt . . .. It is simply that degree of proof which will produce in the trier of fact a firm conviction as to the allegation sought to be established.

*Bemis v. Hare*, 19 Ark. App. 198, 201, 718 S.W.2d 481, 482 (1986) (quoting *Kelly v. Kelly*, 264 Ark. 865, 870, 575 S.W.2d 672, 675-676 (1979)).

7.   Plaintiff maintains that Defendant has been physically abusive of a child other than the minor child and that he has mentally abused Plaintiff. But Plaintiff has presented no "clear, direct, weighty and

16

convincing" testimony to show that any such abuse occurred. Instead, Plaintiff testified that Defendant made statements to members of the Pakistani community within the Little Rock area with the intended purpose of shaming her for seeking a divorce. Countervailing testimony by Defendant's witness explained that he never said disparaging things about Plaintiff. At a minimum, the existence of this factual dispute as to whether such statements were made leaves doubt sufficient to indicate that Plaintiff has not rebutted the presumption in favor of joint custody by clear and convincing evidence.

8.  In support of this joint custody finding, the Court observes that both parents have shown clearly that they love their children. They both desire to be with the minor child until he turns 18 years old. Defendant is the chief resource provider for the family and is capable of providing for the basic needs of the minor child when the child is in his care. Likewise, Plaintiff has demonstrated that with supporting financial resources, she is capable of providing care and a loving home to the minor child. There has been shown no reason why it would not be in the child's best interest that joint custody be awarded to the parents.

. . . .

17. The primary factors this Court considered in awarding alimony was the financial need of Plaintiff and the Defendant's ability to pay. Additional factors include: the Parties' financial circumstances; the amount[and] nature of the parties' income, both current and anticipated; the extent and nature of the parties' resources and assets; the parties earning ability and capacity. *Bailey v. Bailey*, 97 Ark. App. 96,101,244 S.W.3d 712, 716 (2006). Plaintiff is an educated individual with a substantial earning potential, but her lack of work history means that it may take time for her to reach that earning potential. Through [sic] Plaintiff has little income as she is willfully unemployed, her anticipated income in the future would provide for her daily needs. The Parties are in significant debt, apparently due to overspending, and both Parties need to reduce their spending. The Court finds that Defendant shall pay Plaintiff alimony in the amount of five-thousand dollars ($5,000.00) per month for seven (7) years which satisfies both Plaintiff's need and Defendant's ability to pay. The seven-year duration will give Plaintiff adequate time to pursue her chosen education path or employment. These payments shall

commence on November 1, 2021. This support shall not terminate under Ark. Code Ann. § 9-12-312(a)(2)(A-F).

a.  Defendant's April 27, 2022 Motion to Modify Spousal Support is denied.

b.  Plaintiff's February 10, 2023 Counter-Motion to increase Spousal Support is denied.

18. CHILD SUPPORT: Based on case law that has come out subsequent to October 27, 2021, a change in the Plaintiff's income in March 2022, and a change in Defendant's income in November 2022, the Court finds it is appropriate to modify the Defendant's child support obligation retroactive to October 27, 2021, then a modification as of March 1, 2022, and then a modification effective November 1, 2022.

For the months of November 2021 through February 2022, the Court finds that Plaintiff had a gross monthly income of $ 6,906.67 based on an imputed income of $1,906.67 per month, plus $5,000.00 per month in spousal support and Defendant had a gross monthly income of $38,656.50, based on an income of $43,656.50, minus $5,000.00 in ordered spousal support. The total monthly income of the Parties was $45,563.17 as determined under revised Administrative Order 10 creating a basic level of support for the child of $1,952.00 per month. Defendant also covers the child's health insurance at the rate of $240.00 per month. Plaintiff's income is 15.16% and the Defendant's income is 84.84% of the combined monthly income. Therefore, pursuant to the revised Administrative Order 10, the Defendant owed a monthly child support obligation of $1287.00 during this time period. During this time period, the Defendant actually paid $1,518.22 per month. Therefore, he overpaid and shall have a credit of $924.88 for this time period.

For the months of March 2022 through October 2022, the Court finds that Plaintiff had a gross monthly income of $10,071.25 based on an income of $5,071.25 per month, plus $5,000.00 per month in spousal support and Defendant had a gross monthly income of $38,656.50, based on a monthly income of $43,656.50, minus $5,000.00 in ordered spousal support. The total monthly income of the Parties was $48,727.75 as determined under revised Administrative Order 10 creating a basic level of support for the child

18

of $1,952.00 per month. Defendant also covers the child's health insurance at the rate of $240.00 per month. Plaintiff's income is 20.67% and the Defendant's income is 79.33% of the combined monthly income. Therefore, pursuant to the revised Administrative Order 10, the Defendant owed a monthly child support obligation of $1,046.00 during this time period. During this time period, the Defendant actually paid $1,518.22 per month. Therefore, he overpaid and shall have a credit of $3,777.76 for this time period.

Beginning November 2022, the Court finds that Plaintiff had a gross monthly income of $10,071.25 based on an income of $5,071.25 per month, plus $5,000.00 per month in spousal support and Defendant had a gross monthly income of $34,832.00, based on a monthly income of $39,832.00, minus $5,000.00 in ordered spousal support. The total monthly income of the Parties was $44,903.25 as determined under revised Administrative Order 10 creating a basic level of support for the child of $1,952.00 per month. Defendant also covers the child's health insurance at the rate of $240.00 per month. Plaintiff's income is 22.43% and the Defendant's income is 77.57% of the combined monthly income. Therefore, pursuant to the revised Administrative Order 10, the Defendant owed a monthly child support obligation of $969.00 during this time period. During this time period, the Defendant actually paid $1,518.22 per month. Therefore, he overpaid and shall have a credit of $6,041.42 for the time period of November 2022 through September 2023. Defendant's child support obligation going forward shall remain at $969.00 until such time as it may be modified by this Court.

. . . .

34. Defendant's Motion for Contempt filed January 26, 2023 is granted. The Plaintiff did not comply with the order. There is evidence that the Plaintiff prevented production of records in a timely fashion from Regions Bank and she did not act timely to obtain the records to produce in compliance with the Agreed Order entered December 15, 2022. Plaintiff is found in Contempt of Court, and Defendant is awarded $500.00 in attorney fees.

35. Plaintiff's January 26, 2023 Motion for Contempt and for Other Relief Due to Harassment and Abuse of Process by Defendant is denied.

Three child-support worksheets reflecting the three periods were attached to the amended decree ("2023 Decree"). Shahid filed her timely notice of appeal and Masood filed a cross-appeal.

## II. *Points on Direct Appeal*

### A. Whether the Circuit Court Erred in Its Determination of Masood's Child-Support Obligation by Miscalculating His Income

Our standard of review on appeal from a child-support order is de novo on the record, and we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Slayton v. Dill*, 2024 Ark. App. 372, 691 S.W.3d 279; *David v. David*, 2022 Ark. App. 177, 643 S.W.3d 863. In reviewing a circuit court's findings, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be given to their testimony. *Id*. As a rule, when the amount of child support is at issue, we will not reverse the circuit court absent an abuse of discretion; however, a circuit court's conclusion of law is given no deference on appeal. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007).

Shahid argues that the circuit court erred in its determination of Masood's child-support obligation by miscalculating his income. The circuit court divided child support into three time periods:

### 1. *Masood's income from November 2021 to October 2022*

Shahid first argues that the circuit court erred in determining Masood's income from November 2021 until October 2022, which were the first two periods calculated by the

circuit court in paragraphs 18(a) and (b) of the amended decree in the amount of $43,656.50.[5] Shahid states that the court's finding that his monthly income during this time was $43,656.50 is incorrect for two reasons.

Shahid argues that the record does not support a finding that Masood's income on his affidavit of financial means ("AFM") was $43,656.50. Masood's AFM presented at the 2021 hearing stated that his income was $46,656.50 with a notation to see the attached calculation. The attached calculation sheet as testified by Masood showed $45,656.50 as his correct monthly income. The record does not support the circuit court's finding of $43,656.50 as Masood's income.[6]

Shahid also asserts that the circuit court failed to follow Arkansas Supreme Court Administrative Order No. 10 by using the income Masood reported on his AFM rather than his gross income to which he testified and as shown in the amount of $62,471.50. Specifically, Shahid argues that allowing Masood to deduct $16,815 in "business expenses" from his gross income was in contravention of Administrative Order No. 10. We agree.

In determining an appropriate amount of child support, courts are to refer to the most recent revision of the family-support chart in Administrative Order No. 10. Ark. Code

---

[5]Before reduction for spousal support and Shahid's income—imputed in paragraph 18(a) and actual income in paragraph 18(b).

[6]Because we are remanding this case with respect to calculation of child support for all three periods with the directive to follow Administrative Order No. 10, we do not address this error any further.

Ann. § 9-12-312(a)(3)(A) (Repl. 2020). The sections of Administrative Order No. 10 that are

pertinent to this appeal provide:

Section III. Gross Income

2. <u>Gross Income Inclusions:</u> "Income" is "intentionally broad and designed to encompass the widest range of sources consistent with the State's policy to interpret 'income' broadly for the benefit of the child." *Evans v. Tillery*, 361 Ark. 63, 204 S.W.3d 547 (2005); *Ford v. Ford*, 347 Ark. 485, 65 S.W.3d 432 (2002); *McWhorter v. McWhorter*, 346 Ark. 475, 58 S.W.3d 840 (2001); *Davis v. Office of Child Support Enforcement*, 341 Ark. 349, 20 S.W. 3d 273 (2000).

Gross income includes, but is not limited to, the following:

  i.    Wages, overtime pay, commissions, regularly-received bonuses, or other monies from all employers or as a result of any employment (as usually reported in the Medicare, wages, and tips section of the parent's W-2).

  ii.   Earnings generated from a business, partnership, contract, self-employment, or other similar arrangement, or from rentals.

 . . . .

3. <u>Income from Self-employment, Business Owners, Executives, and Others</u>

a. Difficulty in determining income for self-employed individuals, business owners, and others occurs for several reasons including:

   . . . .

b.    To determine monies that a parent has available for support, it may be necessary to examine business tax returns, balance sheets, accounting or banking records, and other business documents to identify additional monies a parent has available for support that were not included as personal income. At a minimum, a self-employed parent shall provide their two most recent years of state and federal tax returns. The parent should provide three years of tax returns when there is a reduced, deferred, or elective income situation. Unless otherwise

> prohibited by law, the court may award expert witness fees when necessary to determine self-employed parent's income.

> c. For income from self-employment, proprietorship of a business, or ownership or a partnership or closely held corporation, gross income is defined as gross receipts minus ordinary and necessary expenses required for self-employment or business operation, including an employer's share of FICA. . . . The court's duty is to accurately determine a child-support obligation in every case. This amount may differ from the determination of business income for tax purposes.

A review of the entire record reflects that the circuit court made its decision on the child-support calculation in paragraphs 18(a) and (b) of the 2023 Decree on the unfiled 2020 joint tax return and the AFM provided by Masood. From a review of the 2020 joint tax return, Masood's sole source of income was generated from his ownership of the stock in and employment by the Corporation, which was an "S" corporation required to file its own tax return—an 1120S.[7] The parties' 2020 tax return reflected that Masood received wages in the amount of $141,200 from the Corporation and a distribution of $524,607 as a shareholder of the Corporation, totaling $665,807 in gross income. It is undisputed that Masood listed his gross monthly business income as $62,471.50, which he included on the attached sheet to his AFM. However, Masood reduced his gross income by $16,815 in "business expenses" as reflected on defendant's exhibit 2, which was presented at the August 2021 trial and provided:

---

[7]In response to the request for clarification presented in a letter by Masood's counsel, the circuit court clarified that it was basing its decision on the calculation of child support for the first two periods only on the evidence at the August 2021 trial.

| Gross Business Income | $ 62,471.50 |
|---|---|

Business Expenses

| | |
|---|---|
| Medical License | $ (50.00) |
| DEA Fee | $ (100.00) |
| Malpractice Ins. | $ (450.00) |
| Pager | $ (15.00) |
| Disability Ins. | $ (650.00) |
| Simmons Loans | $ (5,600.00) |
| BHG Pinnacle Loan | $ (2,450.00) |
| BHG Credit | $ (1,000.00) |
| Accountant | $ (1,000.00) |
| LR Clinic | $ (5,500.00) |
| Net Business Expenses | $ (16,815.00) |

| Gross Personal Income | $ 45,656.50 |
|---|---|

The court erred in allowing Masood to deduct any of the claimed "business expenses" from his gross personal income. Masood did not operate a business in his individual capacity; as such, he did not have any business expenses to deduct on the joint personal income tax return. Allowing him to deduct these nondeductible expenses before calculating income for child-support purposes was in violation of Administrative Order No. 10. Further the record reflects that the loan repayments were for old business loans to the Corporation and to the extent deductible, these payments would have been deductible on the Corporation's income tax returns, not Masood's.[8]

---

[8]Whether these loan repayments would have been deductible by the Corporation is not before the Court. But for purposes of compliance with Administrative Order No. 10 (3)(b). it may be necessary to examine business tax returns, banking records, and other documents to identify additional monies a parent has available for support that were not included as personal income.

Masood's business was operated through the Corporation, and Administrative Order No. 10 states, "the court should carefully review income and expenses from a parent's self-employment or operation of a business to determine actual levels of gross income available to the parent." Ark. Sup. Ct. Admin. Order No. (3)(c). The court further erred in not requiring a review of the Corporation's 2020 income tax return. The court allowed Masood to deduct $16,815 in business expenses without any examination of whether those expenses were ordinary and necessary or whether these expenses were taken on the corporate return for 2020.[9] The court had the Corporation's 2021 and 2022 corporate income tax returns available for review at the second trial but did not review those returns.

## 2. *Masood's income as of November 2022*

Shahid argues that the circuit court also erred in determining Masood's income after November 2022 by failing to follow Administrative Order No. 10. Masood explained that the Corporation had entered into a new contract with JRMC and submitted that contract in support of his testimony and his AFM reflecting his base pay income of $39,832 a month, which is significantly less than his income under the earlier contracts. However, under the new contract there was a "reconciliation" to be made at the end of the fiscal year. Masood stated he might receive more than the base pay if he "worked day and night." The court did

---

[9]Had Masood operated his business as a sole proprietorship or a single-member limited liability company rather than a corporation he may have been able to deduct ordinary and necessary business expenses for purposes of determining his child-support gross income. However, he did not, and the court erred in allowing any expenses to be deducted from his child-support obligation as set forth in paragraphs 18(a) and (b).

not take the possible reconciliation into account. The end of the first year of the contract was October 31, 2023, which was after the trial. The circuit court erred by failing to address the reconciliation payments, or by failing to account for the reconciliation. As an alternative, the court could have used the historical earnings given it had Masood's income tax returns for 2021 and 2022.

However, we find no merit in Shahid's argument that income should be imputed to him on the basis of his previous two years of tax returns. The testimony provided Masood was still working full time under his new contract by seeing patients Monday through Thursday and handling administrative tasks on Fridays. While his income may have decreased from his previous two years, he testified he was working fewer hours because he wanted to slow down and have more time to care for MC. The circuit court was free to make a credibility determination and accept his testimony as to why he accepted a lesser paying contract.

With respect to the child-support determinations as set forth in paragraphs 18(a)–(c) of the 2023 Decree, we reverse and remand to the circuit court to comply with Administrative Order No. 10 for all three periods.

B. Whether the Circuit Court Erred in Its Award of $5000 a Month in Alimony to Shahid for Seven Years

Shahid next argues that the circuit court erred in its award of $5,000 a month in alimony to Shahid for seven years. On appeal, this court reviews divorce cases de novo on the record. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). Moreover, we will not

reverse a circuit court's finding of fact in a divorce case unless it is clearly erroneous. *Id.* A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Chekuri v. Nekkalapudi*, 2020 Ark. 74, 593 S.W.3d 467. We give due deference to the circuit court's determination of the credibility of the witnesses and the weight to be given to their testimony. *Id.*

The purpose of alimony is to rectify the economic imbalances in earning power and standard of living in light of the particular facts in each case. *Richards v. Richards*, 2022 Ark. App. 309, 651 S.W.3d 190. The primary factors to be considered in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Kuchmas v. Kuchmas*, 368 Ark. 43, 243 S.W.3d 270 (2006). The circuit court may also consider other factors, including the couple's past standard of living, the earning capacity of each spouse, the resources and assets of each party, and the duration of the marriage. *Page v. Page*, 2010 Ark. App. 188, 373 S.W.3d 408. The decision to grant alimony lies within the sound discretion of the circuit court and will not be reversed on appeal absent an abuse of discretion. *Medlin v. Medlin*, 2020 Ark App. 159. A circuit court abuses its discretion when it exercises its discretion improvidently or thoughtlessly and without due consideration. *Id.*

At the first trial in August and September 2021, Shahid requested that she be awarded alimony of $25,000 a month for life. After the circuit court awarded her only rehabilitative alimony in the amount of $5,000 a month for seven years, she asked that alimony be modified and increased at the August 2023 hearing.

27

On appeal, Shahid's lengthy argument is summarized in her second to last sentence under this point. "It simply was not fair, just, or equitable for [Shahid] to have been awarded only $5,000 per month in alimony for a period of only seven years when [Masood's] ability to pay was so significant." At the time of the 2021 trial, Shahid had a bachelor's degree, but she was unemployed. She blamed Masood for her unemployment, but Masood denied those claims. The court found Shahid to have been "willfully unemployed." The court made a finding based on the parties' testimony. The circuit court ultimately required Masood to pay all the marital debt, which reduced his ability to pay. Further, there was testimony that Shahid's need for money was due to her lavish spending habits, including the numerous trips she has taken, purchase of a $400,000 home and new vehicle, and her desire to continue to pay for the significant monthly expenses of the parties' two adult children. Given these facts, and our deference to the circuit court with respect to the credibility of the witnesses, we cannot say that the court abused its discretion with respect to the award of alimony.

C. Whether the Circuit Court Erred in Finding that Shahid Did Not Rebut the Presumption that Joint Custody Was in the Best Interest of the Children

Shahid argues that the circuit court erred in finding that Shahid failed to rebut the presumption that joint custody was in MC's best interest. In reviewing child-custody cases, we consider the evidence de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that

28

a mistake has been made. *Cooper v. Kalkwarf*, 2017 Ark. 331, 532 S.W.3d 58. It is well settled that the primary consideration is the welfare and best interest of the child, while other considerations are merely secondary. *McNutt, supra.* We give due deference to the superior position of the circuit court to evaluate and judge the credibility of the witnesses in child-custody cases, and this deference to the circuit court is even greater in cases involving child custody, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Cooper, supra.*

Arkansas Code Annotated section 9-13-101(a)(1)(A)(iv)*(a)* declares a rebuttable presumption that joint custody is in the best interest of the child in actions concerning an original child custody determination in a divorce matter. The presumption may be rebutted if the court finds by clear and convincing evidence that joint custody is not in the best interest of the child; if the parties have reached an agreement on all issues related to custody of the child; if one of the parties does not request sole, primary, or joint custody; or if a rebuttable presumption described in subsection (c) or subsection (d) of this section is established by the evidence. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(b)*.

> If a party to an action concerning custody of or a right to visitation with a child has committed an act of domestic violence against the party making the allegation or a family or household member of either party and such allegations are proven by a preponderance of the evidence, the circuit court must consider the effect of such domestic violence upon the best interests of the child, whether or not the child was physically injured or personally witnessed the abuse, together with such facts and circumstances as the circuit court deems relevant in making a directive pursuant to this section.

*Id.* § 9-13-101(c)(1).

Shahid argues on appeal as she did below that she rebutted the presumption of joint custody because Masood was abusive. Here, the circuit court made the following findings regarding Shahid's contention:

> Plaintiff maintains that Defendant has been physically abusive of a child other than the minor child and that he has mentally abused Plaintiff. But Plaintiff has presented no "clear, direct, weighty and convincing" testimony to show that any such abuse occurred. Instead, Plaintiff testified that Defendant made statements to members of the Pakistani community within the Little Rock area with the intended purpose of shaming her for seeking a divorce. Countervailing testimony by Defendant's witness explained that he never said disparaging things about Plaintiff. At a minimum, the existence of this factual dispute as to whether such statements were made leaves doubt sufficient to indicate that Plaintiff has not rebutted the presumption in favor of joint custody by clear and convincing evidence.

Although Shahid alleged that there was one incident of Masood pulling their middle son's ear and hitting him on the back when he was in middle school, she denied any other physical acts or abuse of any other family member including MC. That incident was years before Shahid filed for divorce. She testified that Masood was emotionally abusive; however, the circuit court was not required to believe her self-serving testimony. The circuit court heard testimony from Masood denying Shahid's allegations and from Sheikh stating that Masood is a wonderful father. Given the evidence presented, and our deference to the circuit court with respect to credibility determinations, we cannot say that the circuit court's findings were clearly erroneous. We affirm the circuit court on this issue.[10]

---

[10]The court used the incorrect standard, when it cited "clear, direct weighty and convincing testimony" to show such abuse occurred. The proper standard is whether the

30

D. Whether the Circuit Court Erred in Finding that Shahid Was in Contempt

Shahid argues that the circuit court erred in finding that she was in contempt. Contempt can be civil or criminal. *Symanietz v. Symanietz*, 2021 Ark. 75, 620 S.W.3d 518. In determining whether a particular action by a court constitutes criminal or civil contempt, the focus is on the character of relief rather than the nature of the proceeding. *Ivy v. Keith*, 351 Ark. 269, 92 S.W.3d 671 (2002). Therefore, the nature of the proceedings determines our standard of review. The purpose of criminal contempt is to preserve power, vindicate the dignity of the court, and punish for disobedience of the court's order. *Symanietz, supra.* By comparison, civil contempt proceedings are instituted to preserve and enforce the rights of private parties to lawsuits and to compel obedience to orders made for the benefit of those parties. *Id.* Because civil contempt is designed to coerce compliance with the court's order, the contemnor may free himself or herself by complying with the order. *Conlee v. Conlee*, 370 Ark. 89, 257 S.W.3d 543 (2007). In other words, civil contemnors "carry the keys of their prison in their own pockets." *Ivy*, 351 Ark. at 280, 92 S.W.3d at 678. Criminal contempt, by contrast, carries an unconditional penalty solely and exclusively punitive in character, and the contempt cannot be purged. *Ivy, supra*; *Fitzhugh v. State*, 296 Ark. 137, 752 S.W.2d 275 (1988). Appellate courts have often noted that the line between civil and

party showed by a preponderance of the evidence that domestic abuse occurred. However, this is not of any consequence given the court's factual findings.

criminal contempt may blur at times. *Ivy, supra.* Shahid argues that the court charged her with criminal contempt, and that this was error as punitive.

Here, the circuit court awarded attorney's fees in the amount of $500 for Shahid's contempt. We addressed the issue of whether the award of attorney's fees is a form of civil or criminal contempt of court in *Applegate v. Applegate*, 101 Ark. App. 289, 293–94, 275 S.W.3d 682, 685 (2008), in which we held the following:

> [O]ur supreme court has set a bright-line rule that aids our resolution of the first question before us—whether the $500 attorney fee was in essence a "punitive fine" for criminal contempt. A contempt fine for willful disobedience that is payable to the complainant is remedial, and therefore constitutes a fine for civil contempt, but if the fine is payable to the court, it is punitive and constitutes a fine for criminal contempt.

(Citations omitted.); *see also Burrow v. J.T. White Hardware & Lumber Co.*, 2018 Ark. App. 212, 547 S.W.3d 500.

Because the award in the present case was not paid to the court but rather as attorneys' fees to the opposing party, it would be treated as civil contempt. Thus, we will address the circuit court's finding of contempt under our standard of review and the law on civil-contempt matters.

Our standard of review for civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. *Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 156 S.W.3d 228 (2004). In order to establish civil contempt, there must be willful disobedience of a valid order of a court. *Applegate*, 101 Ark. App. 289, 275 S.W.3d 682. However, before one can be held in contempt for violating the circuit court's order, the order must be definite in its terms and clear as to what duties it imposes. *Id.*

32

An agreed order was entered on December 15, 2022, requiring Shahid to produce certain financial documents by January 6, 2023.[11] Shahid admitted at trial that she did not produce all the documents as required, but she explained that she did the best she could and claimed her failure was not willful. The terms of the agreed order with respect to the information Shahid was to produce and the timing of that production were definitive and clear. The circuit court was not required to believe Shahid's testimony that this was not willful, and the use of the word "prevented" in its order indicates that the court found the failure to produce willful.

We cannot say that the circuit court's finding of civil contempt was against the preponderance of the evidence. We affirm.

### E. Whether the Circuit Court Erred in Failing to Find Masood in Contempt for His Failure to Voluntarily Pay the Parties' Joint Tax Debts

Shahid finally argues that the circuit court erred in failing to find Masood in contempt for his failure to voluntarily pay the parties' joint tax debts as he was required to do pursuant to paragraph 26 of the 2021 Decree. The circuit court denied Shahid's motion for contempt in the 2023 Decree in paragraph 35.

Before one can be held in contempt for violating the circuit court's order, the order must be definite in its terms and clear as to what duties it imposes. *Applegate*, *supra*. Paragraph 26 of the 2021 Decree did not provide a date certain for this tax debt to be paid.

---

[11]Although the order states that the documents shall be produced by January 6, 2022, this clearly was a scrivener's error and should have stated January 6, 2023.

Shahid argues that a standard of "reasonableness should be imposed." When questioned on payment of the tax debt, Masood presented testimony justifying why the tax debt had not been paid and that he had been paying other debts that had higher interest rates by the time of the 2023 hearing. Because Paragraph 26 did not provide a definite timeline for paying the debts, we affirm the court's holding that Masood was not in contempt.

### III. *Cross-Appeal*

On cross-appeal, Masood argues that the court abused its discretion by ordering that the alimony would be payable for seven years, regardless of whether Shahid remarried, in violation of Ark. Code Ann. § 9-12-312(a)(2).

Arkansas Code Annotated section 9-12-312(a)(2)(A) provides in pertinent part:

(2) *Unless otherwise ordered by the court* or agreed to by the parties, the liability for alimony shall automatically cease upon the earlier of:

(A) The date of the remarriage of the person who was awarded the alimony.

(Emphasis added.). Here, the 2023 Decree awarded alimony and addressed whether it would cease in the event Shahid remarried. The circuit court stated in paragraph 17, "The seven-year duration will give Plaintiff adequate time to pursue her chosen education path or employment. These payments shall commence on November 1, 2021. This support shall not terminate under Ark. Code Ann. § 9-12-312(a)(2)(A)."

Even if the automatic termination as provided in section 9-12-312(a)(2)(A) would otherwise be applicable to this alimony award, it would only be applicable "[u]nless otherwise

ordered by the court." The circuit court ordered that section 9-12-312(a)(2)(A) was not applicable in this instance and provided an explanation for the alimony award. The circuit court did not abuse its discretion with respect to the award of alimony; accordingly, the award of alimony by the circuit court is affirmed.

Affirmed in part and reversed and remanded in part on direct appeal; affirmed on cross-appeal.

KLAPPENBACH, C.J., and HIXSON, J., agree.

*The Applegate Firm, PLLC*, by: *Kayla M. Applegate*, for appellant/cross-appellee.

*Castleberry Law Firm, PLLC*, by: *Kenneth P. "Casey" Castleberry*; and *Dodds, Kidd, Ryan & Rowan*, by: *Lucas Z. Rowan*, for appellee/cross-appellant.